In Matter of Petition of Dominic Jambrone and Angela
 Jambrone, His Wife, to Adopt Pamela Rose Gorra,
 a Minor.
Dominic Jambrone and Angela Jambrone, Petitioners-
 Appellees, v. Mageed David and Mary Gorra
 David, Defendants-Appellants.

Gen. No. 47,280.

First District, Third Division.

April 9, 1958.

Rehearing denied May 7, 1958.

Released for publication May 9, 1958.

Rothschild, Hart, Stevens & Barry, of Chicago (Norman J. Barry, and William G. Myers, of counsel) for defendants-appellants, Mageed David and Mary Gorra David.

Bernard B. Brody, of Chicago, for petitioners-appellees.

PRESIDING JUSTICE BURKE delivered the opinion of the court.

Dominic Jambrone and Angela Jambrone filed a petition in the County Court to adopt Pamela Rose Gorra. Before any hearings were had, Mageed David, who had acknowledged the child as his own and had married the mother of the child, appeared in opposition to the petition. The case was transferred to the Superior Court and heard on an amended petition, answers and replies. A decree of adoption was entered in favor of the petitioners and this appeal followed.

As grounds for adoption the original petition alleged that Mary Gorra was the mother and "sole surviving parent" of the child, and that she had consented to the adoption. After evidence had been taken on the question of paternity an amended petition was filed which omitted the allegation that the mother was the "sole surviving parent." As grounds for adoption the amended petition alleged that the mother had consented and that the "alleged father" had abandoned and deserted the child, had not assisted in her support and maintenance, and "if he is the father," was unfit to have the care and custody of the child. The answers alleged that Mageed David is the father of the child,

denied the allegations as to abandonment, desertion and unfitness, and denied the validity of the mother's consent. The replies did not deny the allegations that Mageed David is the father of the child. Defendants' theory of the case is that Mageed David is the father of the child; that no valid decree of adoption can be entered in the absence of his consent or some statutory grounds to excuse the absence of his consent; and that since he did not consent to the adoption and since petitioners have not proven any of the statutory grounds for excusing his consent, the decree of adoption should be reversed and the amended petition dismissed. Petitioners' theory of the case is that Mageed David's consent was not necessary because he was not the lawful father of the child, the child having been born out of wedlock, and that the mother could not revoke her consent to the adoption because her consent was voluntary and obtained without fraud or duress.

The child was born at Chicago on August 24, 1955, the first and only child born to Mary Gorra David, also known as Mary Gorra. The mother is of Syrian descent, born in Chicago on February 22, 1917. She has a grammar school education, and prior to 1954 lived all of her life in Chicago. On September 22, 1942, she married Michael Gorra. No children were born of that marriage. Mr. Gorra died in June, 1953. Mageed David was born in Syria on July 5, 1897. He has difficulty understanding the English language, cannot spell and cannot read well. He has lived in the same neighborhood in Cedar Rapids, Iowa, since about 1916. On February 18, 1925, he married Constance George. Five children were born of that marriage, which was ended on August 8, 1940, by a divorce decree. The decree awarded the care, custody and control of four of the children to David and his former wife gave the custody of the fifth child to him within a week of the decree. All five children were minors at the time and David has reared them. He is a butcher

106

for Wilson & Company, having worked for that corporation or its predecessor for thirty-four years. He has an excellent record with his employer.

Mageed David first met Mary Gorra in September, 1953. She had accompanied his sister on a visit to him in Iowa. They visited David at his home in Cedar Rapids. After Mary returned to Chicago the parties kept in contact with each other. About two weeks later David came to Chicago to see her. During the next seven months he came to Chicago to see her on about seven or eight weekends. During that time they telephoned each other frequently. David came to Chicago in April, 1954, at which time he and Mary decided to get married. He took her back to Iowa with him and she came to live with him at his home. He owns a duplex house. His seven room apartment is in one-half of the building and he leases the other apartment. In April, 1954, two of his sons were living at home. When David and Mary returned to Iowa in April, 1954, they commenced to live together as husband and wife. In August, 1954, they attempted to have a formal marriage performed and went so far as to have premarital blood tests in accordance with the Iowa requirements. However, David had been on the verge of a nervous breakdown and his doctor advised against the marriage.

Mrs. David testified that she lived with David as husband and wife from April, 1954 to June, 1955, and that she had not had intercourse with anyone other than David from April, 1954, until the time she testified. David testified that he and Mrs. David lived as husband and wife from April, 1954 to June, 1955, and that he had sexual intercourse with her from time to time from April, 1954, to the time he testified. In 1955 David suffered a nervous collapse and with the exception of two weeks in April was unable to work between January and November. During this period of unemployment financial problems and a misunder-

standing between Mary and David's children led to a family quarrel in June. She had an argument with the children which led to the misunderstanding. She became angry and left the Cedar Rapids home about June 16, 1955. David tried to stop her from leaving. When she left Cedar Rapids she was about seven months pregnant. She came to Chicago but did not tell him where she was going. He did not hear from her again or learn of her whereabouts until August, 1955.

Dr. Leonard Friedman of Chicago attended Mary during the last months of her pregnancy. He testified that she never gave him the specific name of the father of her child, but he remembered that she told him the father lived in Iowa. During the end of her pregnancy Mary felt helpless. She did not know what she would do after the baby was born and felt that if she could not give the child care, she would have to give it up. She told Dr. Friedman that she did not want to give up her child, but that she felt helpless. She told him she wanted to give the baby up for adoption. Dr. Friedman told her he knew of a childless couple and would arrange to give the child to them. Mary telephoned David in August, 1955. He had not heard from her since June. She had asked him to marry her while she was pregnant, but he was very sick. He had gone to the hospital in July and his doctors would not let him come to marry her in August. He never refused to marry her. She called him a second time in August, a few days after the first call. On that occasion she asked him to send her money. He sent her $400 or $450 through his employer's credit union. The credit union receipts show he sent her $200 in August and $200 in September. Mary did not tell him of the proposed adoption.

Mary's child, Pamela Rose, was born on August 24, 1955. Just six days previously Dr. Friedman had made arrangements for the petitioners to adopt the child.

In the hospital Mary said she would go ahead with the arrangements. She stayed in the hospital five days. During that period she was interrogated by Geraldine Meile, obstetrical supervisor at the hospital, for the purpose of filling out a birth certificate. The certificate shows the father of the child as "deceased." Mary denied that she had ever said that the father of the child was deceased. She said that she informed Miss Meile that her first husband was dead. He had died two years previously in the same hospital. Mary left the hospital August 29, 1955, five days after her baby was born. On that day she was interviewed by a social worker of the Cook county Department of Welfare. When she left the hospital she was accompanied by a nurse from Dr. Friedman's office. She was taken to an attorney's office and then to the Cook county Welfare Department office where she was interviewed, and finally to the County Building where she signed an appearance and consent to the adoption. She was thirty-eight years old at the time.

David came to Chicago in September, 1955. It was at that time that he learned that Mary had given up the child. He had never authorized her to consent to the child's adoption. He asked her where the baby was. She told him that she had given it up. He was very disturbed about it and wanted to know why. He asked her to come back home and in October, 1955, she went back to Iowa to live with him. They have lived together as husband and wife ever since. They solemnized their marriage in Chicago on May 5, 1956. Upon their return to Iowa in October, 1955, the parents made immediate efforts to obtain the child. They first went to an Iowa attorney named Fred Fisher. He corresponded with the Legal Aid Bureau in Chicago and referred the Davids there. They came to Chicago to see Mr. Young at the Legal Aid Bureau in November, 1955. When he was unable to help them, the Davids sought another attorney, Mr. Brownwell, who

referred them to an attorney in Chicago. In April, 1956, they came to Chicago to see the latter attorney who has represented them in the matter ever since. The Davids did not know who had their child until April, 1956. David was not named as a defendant and was not served personally or by publication. He voluntarily appeared as a defendant on May 21, 1956. He had previously filed a habeas corpus petition in the Superior Court against the petitioners.

 The evidence clearly establishes that Mageed David and Mary David are the father and mother of Pamela Rose. Common law marriages are recognized in Iowa. With the exception of the few months that Mary spent in Chicago she and David have lived together in Iowa as husband and wife since April, 1954. Although common law marriages have been abolished in Illinois, where a common law marriage is recognized under the laws of another state so as to make children of the marriage legitimate, that status of legitimacy will be recognized in Illinois. Peirce v. Peirce, 379 Ill. 185; Kattany v. Kattany, 16 Ill.App.2d 148 (Abst.). Under the laws of Iowa there existed a valid common law marriage between Mr. and Mrs. David. See Love v. Love, 185 Ia. 930, 171 N. W. 257; In re Stopps' Estate, 244 Ia. 931, 57 N.W.2d 221.

██ The parties discuss the meaning of the words "parents, or the surviving parent" as used in the statute. Under the previous statute it was held that where the child is illegitimate the consent of the natural father is not required. Carter Oil Co. v. Norman, 131 F.2d 451. We are of the opinion that the words "parents, or the surviving parent" does not embrace the father of an illegitimate child since he is not a parent at common law. See In re Gibson, 154 Mass. 378, 28 N. E. 296; State v. Nestaval, 72 Minn. 415, 75 N. W. 725. It is interesting to note that Sec. 12 of the Paternity Act (Sec. 49, Ch. 17, Ill. Rev. Stat. 1957) provides that a person charged or alleged to be the father of a

110

■■■■■■■■■■■■■■■■■■■■

child born out of wedlock shall have no right to the custody or control of the child except such custody as may be granted pursuant to an adoption proceeding initiated by him for that purpose. This was the rule at common law. Wright v. Bennett, 7 Ill. 587, 591. That provision is consistent with the holding that the father of an illegitimate child is not a "parent" within the meaning of the Adoption Act.

Under the law of Illinois no valid decree could be entered in the absence of consent to the adoption by the parents or some statutory ground for dispensing therewith. Mary David gave her consent. We are of the opinion that the consent was not obtained by fraud or duress. The consent of the mother was valid. The father, Mageed David, did not consent. Upon learning that his child had been given up for adoption he made immediate efforts to regain her. Since that time he has done everything lawfully possible toward that end. The evidence did not establish any statutory basis for dispensing with the father's consent. Mageed David bears a good reputation in the community where he resides. He reared five children by his previous marriage. He owns the house where he lives. He has lived in the same neighborhood for forty years. He has worked steadily in one place of employment for thirty-four years and his income is equal to that of the petitioners. He has an excellent record with his employer and fellow employees and is a trusted employee. Since he did not consent to the adoption and no statutory basis for dispensing with the consent was established, no case was made out for breaking up the natural family and depriving the natural parents of their right to the child.

The Bastardy Act in force at the time of the decree reads: "If the mother of any bastard child and the reputed father shall, at any time after its birth, intermarry, the said child shall in all respects be deemed and held legitimate . . . ." (Sec. 15, Ch. 17, Ill.

111

Rev. Stat. 1955.) Section 12 of the Probate Act (Sec. 163, Ch. 3, Ill. Rev. Stat. 1957) provides that an illegitimate child whose parents intermarry, and who is acknowledged by the father as the father's child, shall be considered legitimate. On December 23, 1957, the First Division of this court, in a well-reasoned opinion by Mr. Justice McCormick, considered a case presenting problems similar to the case at bar. In re Simaner, 16 Ill.App.2d 48. In that case the court said: "It would be a repudiation of the public policy as declared by the legislature, and contrary to the best interests of the child, to hold, as the intervening petitioners urge, that the laggard putative father, by a marriage with the mother occurring at any time before the filing of a petition for adoption, is vested with the right to control the adoption proceedings by either giving or refraining from giving his consent thereto." The facts of the case are significantly different. In the Simaner case there was abandonment and desertion of the child by the natural father. The mother had the child living with her for seven months before she delivered it to a licensed agency for adoption. The mother was allowed to give her consent to the adoption only after the child had been at the agency for almost a month and was eight months old. That case involved a placement through a licensed agency. There was no common law marriage. There could be none because both were residents of Illinois. In the case at bar the father did not abandon the child, but promptly upon learning that the child had been surrendered for adoption, took steps to regain the child. When he learned that the mother was confined he borrowed money which he sent to her. It is clear that in the Simaner case the father lost his rights by his failure to take action for many months.

We recognize that both contesting pairs of parents act from the highest motives. Mageed David and his wife have a good home for their daughter. He did not

112

consent to the adoption, but upon learning that Mrs. David had given his daughter out for adoption he immediately took steps to regain the child. We are convinced that under the facts the Davids should have their child. Therefore, the decree of the Superior Court of Cook county is reversed and the cause is remanded with directions to dismiss the petition for adoption.

Decree reversed and cause remanded with directions.

FRIEND and BRYANT, JJ., concur.