(No. 34919.—

Dominic Jambrone *et al.*, Appellants, *vs.* Mageed David *et al.*, Appellees.

*Opinion filed January 23, 1959—Rehearing denied March 18, 1959.*

Schaefer, Davis, and Klingbiel, JJ., dissenting.

Rudolph L. Janega, of Chicago, for appellants.

ROTHSCHILD, HART, STEVENS & BARRY, of Chicago, (NORMAN J. BARRY, EDWARD I. ROTHSCHILD, and WILLIAM G. MYERS, of counsel,) for appellees.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

Appellants, Dominic and Angela Jambrone, on leave granted by this court, appeal from a judgment of the Appellate Court reversing a decree of adoption whereby they were permitted to adopt Pamela Rose Gorra, a child who had been in their custody since five days after her birth. See: *In re Petition of Jambrone,* 17 Ill. App. 2d 104.

The natural parents of the child are Mary Gorra and Mageed David, now residents of Iowa, who were formally married on May 5, 1956, two weeks after the petition for adoption had been filed, but who claim to have been common-law husband and wife when the child was born in Chicago on August 24, 1955, and when the mother gave her consent to the adoption on August 29, 1955. Common-law marriages are recognized in Iowa and, although abolished in Illinois, where such a marriage is recognized under the laws of another State so as to make children of the marriage legitimate, that status of legitimacy will be given recognition in Illinois. (*Peirce v. Peirce,* 379 Ill. 185.) Both courts below found that the natural mother, Mary Gorra, then thirty-eight years old, had validly consented to the adoption and such finding is not contested. Likewise, under authorities cited and discussed in the opinion of the Appellate Court, they agreed that our adoption statute does not require the consent of a natural father where the child to be adopted is born out of wedlock. The two courts divided, however, on the question of whether or not there was a valid common-law marriage existing between the natural parents when the child was born and the mother's consent to adoption was given. The trial court in effect concluded that no common-law marriage existed, thus rendering the consent of the father unneces-

sary, and that it was in the best interests of the child to remain with the adoptive parents. The Appellate Court found exactly to the contrary and reversed the decree of adoption because the consent of the father had not been obtained. Whether or not the evidence established the existence of a valid common-law marriage is the sole question presented for review.

Appellees, Mageed David and Mary Gorra David, point out that the scope of this court's review is confined to questions of law in cases brought to it from the Appellate Court, (Ill. Rev. Stat. 1957, chap. 110, par. 92(3)(b),) and contend that the Appellate Court's finding of fact with respect to the existence of the common-law marriage is not subject to review. While it is a well settled rule that we will not review the facts as found by the Appellate Court, it is equally true that we may do so when the facts found, in themselves, show as a matter of law a wrong conclusion was reached by that court. (*Briney* v. *Illinois Central Railroad Co.* 401 Ill. 181; *Ruspantini* v. *Steffek,* 414 Ill. 70; *Robinson* v. *Workman,* 9 Ill.2d 420.) Further, it is well established that findings of fact of the Appellate Court may be inquired into by this court where there is no evidence upon which to base such a finding, (*Harrison* v. *Civil Service Com.* 1 Ill.2d 137; *City of Chicago* v. *Hagley,* 338 Ill. 479,) and that it is a question of law whether there is any evidence in a record to support such a finding. (*Duffy* v. *Cortesi,* 2 Ill.2d 511; *Roon* v. *Van Schouwen,* 406 Ill. 617.) In the instant case the Appellate Court has concluded that a common-law marriage, valid in the State of Iowa, existed between the appellees. We shall, therefore, consider the facts only to determine if there is any proper evidence or inferences therefrom tending to prove that appellees enjoyed such a status when the child was born and when the consent of the mother was given. Cf. *McKenna* v. *McKenna,* 180 Ill. 577.

Marriage, as is stated in 35 Am. Jur., Marriage, sec. 5, has its inception in contract, and the majority view, ad-

hered to both in Iowa and Illinois, is that marriage is a civil contract in that it is a present agreement, *per verba de praesenti,* to be husband and wife and assume all the rights and duties of the marital relationship, and in that it is entered into voluntarily by parties who have the capacity to contract marriage. (See: *Seuss* v. *Schukat,* 358 Ill. 27; *Beach* v. *Beach,* 160 Iowa 346, 141 N.W. 921.) At common law no formal ceremony is essential to a valid marriage and, in those jurisdictions where common-law marriages are recognized, an agreement of the parties *per verba de praesenti* (by words of the present) to be husband and wife constitutes a valid marriage, no other ceremony being necessary. (35 Am. Jur., Marriage, sec. 28; 26 I.L.P., Marriages, sec. 20.) There is, however, a difference of opinion as to the necessity of cohabitation and reputation to establish a common-law marriage. Under one view there need be no cohabitation or reputation but only a contract *per verba de praesenti,* such view being based on the premise that marriage is a contract relation, and hence that the fact of marriage may be established by proof of a contract only. Such being the case, cohabitation and reputation merely become evidential facts from which the existence of the contract may be inferred. (See: 33 A.L.R. 30; 35 Am. Jur., Marriage, secs. 29, 30; *Cartwright* v. *McGown,* 121 Ill. 388.) The other view, *viz.,* that cohabitation and reputation are essential to a common-law marriage, is based upon the premise that marriage is a status to which mutual assent is vital, and that such status is not attained until the parties, either through the medium of a ceremonial marriage or by a holding out of themselves as husband and wife, publicly assume such relation. (33 A.L.R. 37, 40.) Such a view is further based on the fact that marriage is a contract in which the public is interested and to which the State is a party. Still another form of common-law marriage given some recognition by canon and common law are marriages *per verba de futuro cum copula* or, in other words, mar-

riages through carnal intercourse after an agreement to be married in the future, the theory being that copula is presumed to have been allowed on the faith of the marriage promise, and that the parties at the time of the copula accepted each other as man and wife. (35 Am. Jur., Marriage, sec. 35; *McKenna* v. *McKenna,* 180 Ill. 577.) According to the *McKenna case,* however, the latter rule is merely a rule of evidence and it is always competent to show by proof that the fact was otherwise. While copulation is admitted in the present case, there is no proof that it was performed on the faith of a marriage promise, thus a common-law marriage may be sustained only if the contract *per verba de praesenti* has been proved.

We are concerned here with an Iowa contract, thus we must look to the requirements and decisions of that State in determining whether the Appellate Court properly concluded from the evidence that a valid common-law marriage existed. That the Iowa test is relatively simple is reflected in the following language from *Gammelgaard* v. *Gammelgaard,* (1956) 247 Iowa 979, 77 N.W.2d 479: "Common-law marriages are recognized as valid in Iowa. *In re Estate of Stopps,* 244 Iowa 931, 57 N.W.2d 221, and cases cited. To establish the existence of such a marriage there must be shown a present intent to be husband and wife, followed by cohabitation. Pegg v. Pegg, supra, at page 575 of 138 Iowa, at page 1028 of 115 N.W.; State v. Grimes, 215 Iowa 1287, 247 N.W. 664, 665. Proof of cohabitation is not in itself sufficient. In re Estate of Medford, 197 Iowa 76, 78, 196 N.W. 728. But such proof, as well as evidence of conduct and of general repute in the community where the parties reside is admissible as tending to strengthen a showing of a present agreement to be husband and wife, and as bearing upon the question of intent. In re Estate of Wittick, 164 Iowa 485, 493, 145 N.W. 913, 916." It is thus to be seen that only the contract *per verba de praesenti,* followed by cohabitation, need be established and that conduct and repu-

tation are but evidential facts which tend to prove or disprove the agreement and intent of the parties.

When called as a witness in the adoption proceeding Mary Gorra David related that she went to Iowa in April, 1954, and thereafter lived with Mageed David as husband and wife. The testimony of the latter was that, in April, 1954, he had come to Mary's home in Chicago, that they talked it over and "thought" they wanted to get married, that she thereafter came to his home in Cedar Rapids, Iowa, and that they lived together as husband and wife from April, 1954, to June, 1955. Appellees, who appear to take the position that their accord makes their status irrefutable, urge that the foregoing evidence is sufficient to establish their common-law marriage. While we can perhaps agree that their testimony establishes cohabitation, it does little to confirm that the cohabitation stemmed from a present agreement of the parties to assume the marital duties and obligations of husband and wife. Furthermore, since the State of Illinois, through its concern for the welfare of the child, is an interested party in the adoption proceeding, it is our opinion that our determination of the marital status is not circumscribed by the testimony of the parties claiming marriage, and that we may consider such evidential factors as conduct and reputation in determining if a contract of marriage, *per verba de praesenti,* did in fact exist. Iowa decisions examined uniformly hold that, on the issue of the existence of a common-law marriage, public repute and the conduct of the parties toward each other may properly be considered. *Pegg* v. *Pegg,* 138 Iowa 572, 115 N.W. 1027; *In re Estate of Medford,* 197 Iowa 76, 196 N.W. 728; *State* v. *Grimes,* 215 Iowa 1287, 247 N.W. 664; *Gammelgaard* v. *Gammelgaard,* 247 Iowa 979, 77 N.W.2d 479.

The record shows that, in September, 1953, Mary Gorra, then 36 years old, was a childless widow whose husband, Michael Gorra, had died in June of that year. She was of Syrian descent, had a grammar school educa-

tion, had been married in 1942, and had lived in Chicago all her life. At the time she had no family other than a brother who resided in California. Mageed David, then 56 years old, had been born in Syria, had been a resident of Cedar Rapids, Iowa, and employed as a butcher there since about 1916, had been married in 1925 and divorced in 1940, and lived in a home he owned. At the time of the divorce he was given the custody of five minor children whom he reared, and whose ages in 1953 were 26, 24, 23, 21 and 15. Mageed David first met Mary Gorra in September, 1953, when she accompanied his sister on a visit to his Iowa home. During the next seven months he visited Mary in Chicago seven or eight times, by his version, or a couple of times, by her version, and they telephoned each other frequently. Mary, it appears, worked for a valve company from 1951 to December 5, 1953, but was laid off on the latter date. In April, 1954, as previously related, David came to Chicago, his description of what transpired being: "We talked it over and thought we wanted to get married." Thereafter, Mary accompanied him to Cedar Rapids and it was the testimony of both that they lived together as husband and wife in the David home where two of David's children also resided. As to sexual intercourse David testified: "During the period we lived together as husband and wife, from April 1954 until the present, I have had sexual relations with her from time to time." Upon cross-examination, however, the abstract of his testimony is as follows: "I can't recall when I first had sexual relations with Mary Gorra. It was after she came in April, some time around September. After September, I next had relations with her in November and December, I guess." Thus the clear import of his testimony is that he had no sexual intercourse with Mary until five months after the parties purportedly bound themselves in a common-law marriage. On the same subject Mary testified only that she had not had intercourse with anyone other than David from April, 1954, to the time she testified.

Further evidence shows that in August, 1954, Mary and David took premarital blood tests as required by Iowa law, but that the wedding plans were called off when a physician advised David not to enter into a marriage due to his nervous condition. Shortly after this occurrence Mary returned to Chicago but, after working there two weeks for a radio company, she came back to Cedar Rapids and lived in the David home until November, 1954. During the latter month she again returned to Chicago and for a four-week period was employed at the valve company where she had previously worked. She returned to Cedar Rapids for the Christmas holidays and it was during this month that she became pregnant, a fact not then known to her. Thereafter she continued to reside in the David home until June, 1955. In 1955 David suffered a nervous collapse and with the exception of two weeks in April was unable to work between January and November. During this period of unemployment, financial problems and a misunderstanding between Mary and David's children led to a family quarrel which culminated in Mary's return to Chicago on June 16, 1955.

Dr. Leonard Friedman, a Chicago physician, testified he examined Mary on June 2, 1955, at which time he informed her she was pregnant. He further stated that she expressed surprise, that she said she thought she could never conceive, and that she told him she was not married, whereupon he advised her to try to get married. At subsequent visits on June 23 and July 26, 1955, according to the physician, she said she had confronted the father and that he would not have any part of her or the baby, that she had not made any headway with the father and was going to get a lawyer after him, and that she wanted the doctor's help in adopting out her child. Similar statements were made during a visit on August 9, 1955, and ten days later Mary expressed her gratification when the doctor informed her he had contacted people who would be willing to adopt the child.

The child was born in a Chicago hospital on August 24, 1955. A birth certificate filled out by the obstetrical supervisor stated that the father of the child was "deceased" but, at the trial, Mary denied having made such a statement and said she had informed the supervisor only that her first husband was deceased. Three days after the birth the physician who, because of Dr. Friedman's absence, had attended Mary in the delivery of the child, asked her if she still wanted to adopt the baby out and was told to go ahead with the arrangements. Upon leaving the hospital, five days after the birth, Mary signed an appearance and consent to adoption at the county building after first being interviewed by an attorney representing the adoptive parents (appellants) and by a social worker in the employ of the Cook County Department of Social Welfare. During the course of the latter interview she admitted that the father of the child was a divorced man with whom she had lived for one and one-half years, after first stating she preferred not to discuss him at all, and stated that she had hoped the father would marry her, that he would not marry her before the child was born and she had hoped he would change his mind after the child had arrived, that she really did not want to place the child out for adoption but knew of no other way out, inasmuch as the father would not marry her and she had to work for a living.

When interviewed by an investigator for the Iowa Welfare Department on June 15, 1956, after appellants' petition for adoption had been filed, Mary stated that she had entered into a common-law arrangement with David in April, 1954, that she talked the situation over with him in June, 1955, when she learned she was pregnant, and that he then felt he could not marry her even though she was pregnant. She told the investigator that he did agree to help her financially and did in fact send her $50 before the child was born, and $400 during the eight weeks she was ill after the birth. In the latter respect documentary evidence established that David had caused checks of $200,

$150, and $50, bearing respective dates of August 4, September 1 and September 16, 1955, to be sent to "Mrs. Mary Gorra."

David came to Chicago in September, 1955, and learned for the first time that the child had been placed with adoptive parents. He asked Mary to come back to Iowa and she did so in October, 1955, the testimony of both being that they have lived together as husband and wife since that time. As heretofore related, they were formally married in Chicago on May 5, 1956, approximately two weeks after appellants filed their petition for the adoption of Mary's child.

The requirements in Iowa are that there must be a present intent to be husband and wife, followed by cohabitation. There is no evidence which directly shows that a contract of marriage was entered into, or that such was the intent of the parties when their cohabitation commenced in April, 1954. Both parties testified concerning the relationship which thereafter existed, but neither testified that it resulted from a present agreement or intention to be husband and wife. It is true that the record shows the parties discussed the question and thought they wanted to get married, but whether they arrived at an agreement to be married at a future day or to be presently married is left unanswered. An agreement to be married at a future day, it is said in 55 C.J.S., sec. 45(b), conclusively negatives the claim of a marriage *per verba de praesenti*. In this respect it is significant that the parties did take steps to be married in August, 1955, and did not engage in sexual relations until September, 1955, after the attempt at marriage had failed. While not conclusive, it is difficult to believe they would have exercised such restraint had they in fact exercised an intent to be married in April, 1954, as they now contend.

Nor do other evidential factors tend to establish that the parties entered into their cohabitation with the prerequisite agreement and intent. On the contrary they do

much to negate a conclusion that the parties ever considered themselves bound by a marriage contract. There is a complete absence of any evidence that Mary and David enjoyed a public or familial reputation of being man and wife, or that they ever held themselves out as such, or that Mary was ever known or represented to be Mary David. Indeed, when David sent her checks in August and September of 1955, they were made payable to either "Mrs. Mary Gorra" or to "Mary Gorra." In the Iowa cases previously cited, such factors have weighed heavily in the determination of whether a contract of marriage, *per verba de praesenti,* was in fact entered into. By way of contrast in this record there are frequent statements by Mary that she was not married and that the father of the child would not marry her. On one occasion she testified she had never asked David to marry her before she had the baby, and on another that she wanted David to marry her and give her child a name, but he could not do so because he was sick. Appellees now assert that her remarks had reference to her desire for a formal marriage, a fact which is held not to prove that she did not enter into a common-law marriage. (See: 55 C.J.S., Marriage, sec. 45(b); *Gammelgaard* v. *Gammelgaard,* 77 N.W.2d at 483.) The same authorities reveal, however, that a subsequent ceremonial marriage between parties to an alleged common-law marriage is a factor to be considered in determining whether a common-law marriage had been entered into. In the present case it cannot escape notice that the ceremonial marriage did not take place until the marital status of the parties had been put in issue by the adoption proceedings, thus raising some question as to whether its purpose was only to formalize an existing common-law marriage. Other circumstances negating a conclusion that the parties ever had a present intent and agreement to be husband and wife before the birth of the child are found in the evidence which shows that Mary returned to Chicago and resumed her employment and residence there upon two occasions between April and November, 1954, the first time

being immediately after their preparations for marriage had been abandoned on the advice of David's physician. We think too that there is significance in the conduct of the parties at the time Mary's pregnancy was discovered. Dr. Friedman testified that he examined Mary on June 2, 1955, and advised her to get married; on June 16, 1955, Mary left the David home ostensibly because of a quarrel with David's children, but, on June 23, 1955, when she was next examined by the physician she stated that she had confronted the father and was told he would not have any part of her or her baby. Thereafter she remained in Chicago and faced her ordeal alone.

The import of the entire record is that the cohabitation of the parties was not attended by present intent or agreement to be husband and wife. Without such an intent, and some manifestation of it by oral or written agreement, conduct, or reputation, a valid common-law marriage could not have been created in April, 1954, when the cohabitation commenced. At best the intention of the parties appears not to have been formed until after the birth of the child and the dispute over its custody arose. Such intent does not relate back to their previous cohabitation and comes too late to defeat appellants' petition for adoption. It is, therefore, our opinion that the Appellate Court was in error when it concluded that a valid common-law marriage existed between the parties. This being so, David's consent to the adoption was not required by our adoption statute. 1 I.L.P., Adoption, sec. 21; *In re Petition of Simaner, Jr.,* 16 Ill. App. 2d 48, 54.

We are not unmindful that David has materially changed his attitude and position since the birth of the child, even to the extent of participating in a ceremonial marriage with the mother. Our courts, however, are committed to the principle that our adoption laws may not be circumvented by a change of heart or a tardy assumption of parenthood. In the case of *In re Petition of Simaner,* 16 Ill. App. 2d 48, (petition for leave to appeal denied, *Simaner v. Simonick,* 13 Ill.2d 627,) it is said: "It would be a repudiation of

the public policy as declared by the legislature, and contrary to the best interests of the child, to hold, as the intervening petitioners urge, that the laggard putative father, by a marriage with the mother occurring at any time before the filing of a petition for adoption, is vested with the right to control the adoption proceedings by either giving or refraining from giving his consent thereto. It must also be considered that the statute requires a delay of six months between the time when the child is taken to the home of the adoptive parents and the filing of a petition for adoption. During that period bonds of affection would undoubtedly have been forged between the adoptive parents and the child, and the breaking of such bonds might have a marked effect on the child both physical and psychological. It was to prevent such disturbances that the legislature made the consent of the parents to the adoption of the child irrevocable." (16 Ill. App. 2d at 56.) This language becomes even more compelling in this case when it is considered that the only valid marriage shown to exist between the mother and father occurred at a time after the adoption proceedings were commenced.

For the reasons stated the judgment of the Appellate Court is reversed and the decree of adoption entered by the superior court of Cook County is affirmed.

*Appellate Court reversed; superior court affirmed.*

Mr. JUSTICE SCHAEFER, dissenting:

I think that the Appellate Court properly found from the evidence that a valid common law marriage existed in Iowa and therefore I dissent. But for a reason that is not expressed in the majority opinion, I also think that this court is authorized to review the finding of the Appellate Court, and so I can not join in Mr. Justice Davis's dissent.

Section 89 of the Civil Practice Act provides that the findings of fact of the Appellate Court shall be final and conclusive "except as to equitable issues," and section 92(3)(b) contains a similar provision. (Ill. Rev. Stat. 1957, chap. 110, pars. 89, 92.) The right to adopt a child was unknown at common law. That right is conferred by statute, but I think

that the issues in such a case are "equitable issues" within the meaning of the Civil Practice Act. "In adoption cases the jurisdiction of the court over the child is the same as that exercised by courts of chancery and is the exercise of the prerogative of the sovereign, springing from its power and duty as *parens patriae* to guard the interest of the defendant and to protect and control it. 2 Story's Eq. Jur. 1333-1341; * * *." *McConnell* v. *McConnell*, 345 Ill. 70, 78.

Mr. Justice Klingbiel joins in this dissent.

Mr. Justice Davis, also dissenting:

The opinion of the court states that "Whether or not the evidence established the existence of a valid common-law marriage is the sole question presented for review," and laboriously attempts to transform this factual question into one of law. Yet, despite its ample treatment of the subject and extensive citation of authorities, the effort falls short of the mark. The Appellate Court found from the evidence that such common-law marriage did exist. Reversal of that determination would require this court to weigh the evidence, a function which is proscribed by statute. (Ill. Rev. Stat. 1957, chap. 110, pars. 89, 92(3)(b).) Therefore, I dissent.

It is undisputed that the Iowa law requires only a present intent to be husband and wife, followed by cohabitation, to constitute a common-law marriage. (*Gammelgaard* v. *Gammelgaard*, 247 Iowa 979, 77 N.W.2d 479; *In re Estate of Stopps*, 244 Iowa 931, 57 N.W.2d 221; *Love* v. *Love*, 185 Iowa 930, 171 N.W. 257; *Smith* v. *Fuller*, 138 Iowa 930, 108 N.W. 765.) The evidence establishes that Mageed David and Mary Gorra talked it over and wanted to get married in April, 1954; that he took her to his home in Iowa where they lived together as husband and wife until June, 1955. This constitutes a *prima facie* case which would justify the finding of the Appellate Court that "Under the laws of Iowa there existed a valid common-law marriage between Mr. and Mrs. David."

In the face of such finding, this court states: "Further-

more, since the State of Illinois, through its concern for the welfare of the child, is an interested party in the adoption proceeding, *it is our opinion that our determination of the marital status is not circumscribed by the testimony of the parties claiming marriage, and that we may consider such evidential factors as conduct and reputation in determining if a contract of marriage, per verba de praesenti, did in fact exist.*" (Italics mine.) It then proceeds to analyze a number of evidentiary matters which it states are "significant," or which "have weighed heavily in the determination of whether a contract of marriage * * * was in fact entered into." .

Under the traditional principles of conflict of laws, a marriage valid where contracted is valid everywhere. Therefore, it is our duty to recognize this common-law marriage if it was valid in Iowa. (*Peirce* v. *Peirce*, 379 Ill. 185.) In this opinion the court has done nothing more than examine all the evidence in the record, as well as certain matters which it refers to as "evidential factors," and it has then disagreed with the Appellate Court as to the weight to be given the various evidentiary facts in determining the ultimate fact of marriage. This constitutes the usurpation of a function which the legislature vested exclusively in the Appellate Court. I protest this action and believe that the court ought to exercise sufficient judicial self-restraint to refrain from reversing the Appellate Court by the semantic transmutation of a question of fact into one of law.

I would affirm the Appellate Court.