*In re* ESTATE OF DAVID C. CROCKETT, Deceased (Natasha Crockett *et al.*, Petitioners-Appellants, v. Laverne Crockett, Personal Representative, Respondent-Appellee).

Fifth District    No. 5—98—0787

Opinion filed April 12, 2000.

Mark S. Rohr and Andrea Crowder Khoury, both of Crowder & Scoggins, Ltd., of Columbia, for appellants.

John L. Bitzer, of Dunham, Boman & Leskera, of Collinsville, for appellee.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Can a third party challenge the validity of a marriage after the death of one of the parties to the marriage? Petitioners, Natasha and David Crockett, appeal the trial court's decision to dismiss their claim against respondent, Laverne Crockett, for failure to state a cause of action. Petitioners raise two issues on appeal: (1) whether their petition to vacate the order appointing a personal representative, to revoke letters of administration issued pursuant thereto, to terminate independent administration, to appoint a successor administrator, and to amend the declaration of heirship stated a cause of action for the removal of respondent as personal representative and for the exclusion

of respondent as an heir, because she was not the decedent's wife, and (2) whether petitioners should have been granted leave to allege a constructive-trust theory. A timely notice of appeal was filed on November 28, 1998.

## I. FACTS

Decedent died on April 30, 1997. Natasha Crockett and David Crockett, children from decedent's previous marriage to Peggy Crockett (dissolution of marriage in 1991), survived him. His wife, Laverne Crockett, survived him as his widow. This appeal concerns the validity of decedent's marriage to Laverne.

Decedent and Laverne were married on April 26, 1997. At the time, decedent suffered from an inoperable malignant brain tumor. The county clerk's office had issued decedent and Laverne a marriage license; however, decedent's physical condition prevented him from signing the application in the presence of either the county clerk or one of his deputies. Decedent never appeared before the county clerk. Both an appearance and a signature in the presence of the county clerk are required by the Illinois Marriage and Dissolution of Marriage Act (hereinafter the Dissolution Act) (750 ILCS 5/203 (West 1996)). At the alleged ceremony, decedent did not respond because of his brain tumor, and a third party was used to acknowledge the marriage vows. Decedent died four days after the alleged ceremony.

On July 29, 1997, Laverne filed a petition for letters of administration of decedent's estate. The petition alleged her status as decedent's wife and requested she be issued letters of administration. The trial court entered an order declaring Laverne, Natasha, and David as decedent's heirs at law. On January 21, 1998, Natasha and David filed a petition requesting the court (1) to vacate the order appointing personal representative, (2) to revoke the letters of administration issued pursuant thereto, (3) to terminate independent administration, (4) to appoint a successor administrator, and (5) to amend the declaration of heirship. The petition specifically sought (1) to vacate the July 29, 1997, order appointing a personal representative, (2) to revoke the letters of administration entered pursuant to the July 29, 1997, order, (3) to appoint Natasha Crockett as administrator of the estate, and (4) to find that, at his death, decedent left Natasha and David Crockett as his only heirs at law. Petitioners contend the marriage never took place because decedent never consented at the ceremony and, therefore, never complied with the formal requirements of solemnization under the Dissolution Act (750 ILCS 5/209 (West 1996)).

Both parties submitted memoranda in support of their position that the petition did or did not state a cause of action. Respondent

argued that the petition did not state a cause of action because the requirements to attack the validity of a marriage were not fulfilled (see 750 ILCS 5/301 (West 1996)). In response, petitioners requested leave to amend their petition to allege a constructive-trust theory. On September 29, 1998, the trial court entered an order striking the petition with prejudice, to the extent it sought to remove Laverne as the representative on the ground that she was not his spouse and because petitioners failed to comply with the requirements for declaring a marriage invalid. According to Part III of the Dissolution Act, parties have standing to challenge the validity of a marriage only for lack of capacity, fraud, or duress, and they are barred from filing suit by a 90-day time limitation or by the death of either party to the alleged marriage. 750 ILCS 5/302 (West 1996). The court held that since decedent died before petitioners instituted the challenge, the case is moot. On October 28, 1998, petitioners filed a motion to reconsider, modify, or vacate the September 29, 1998, order. The trial court denied that motion and all remaining motions of petitioners, including their request to amend the petition to allege a constructive-trust theory. Petitioners filed a timely notice of appeal on November 28, 1998.

## II. ANALYSIS

■ Marriage is a civil contract with three interested parties: the husband, the wife, and the State. See *Jambrone v. David*, 16 Ill. 2d 32, 35, 156 N.E.2d 569, 571 (1959); *Hewitt v. Hewitt*, 77 Ill. 2d 49, 63, 394 N.E.2d 1204, 1210 (1979). In order to legally marry in Illinois, the husband and wife must fulfill the requirements and formalities set out in the Dissolution Act. The parties must be a man and a woman, of age, and freely consent to the contract. See 750 ILCS 5/201 (West 1996). Parties wishing to marry must obtain a license to marry from the county clerk's office of the county in which they intend to marry. Both parties must be present before the county clerk or one of his deputies, and both must sign the license application. 750 ILCS 5/203 (West 1996). The next step is solemnization and registration. The parties must go before a duly authorized officiate and, after consenting to marry, must file the marriage certificate with the county clerk's office within 10 days of the ceremony. 750 ILCS 5/209 (West 1996). If all of these requirements are met, the parties are legally married.

■ In order to challenge the validity of a marriage, the challenging parties must overcome the presumption of validity that Illinois confers upon a marriage. See *Baer v. DeBerry*, 31 Ill. App. 2d 86, 89, 175 N.E.2d 673, 674-75 (1961). Either party may challenge the validity of a marriage by reason of duress, fraud, lack of consent, or lack of mental or physical capacity. 750 ILCS 5/301 (West 1996). In the event

one party is legally incompetent, that person's guardian may bring an action under section 301 of the Dissolution Act (750 ILCS 5/301 (West 1996)). However, an action to challenge the validity of a marriage must be brought within 90 days of the moving party becoming aware of the defect or before either party to the marriage dies. 750 ILCS 5/302 (West 1996). This is the essence of the case before us: Can decedent's heirs challenge after his death an obviously questionable marriage? Part III of the Dissolution Act says no; however, Did the marriage ceremony in question fulfill the statutory requirements of the Dissolution Act warranting the presumption of validity? If it did not, then decedent's heirs have standing to challenge the fact of the marriage in any court proceeding even after decedent's death. See *Barber v. People*, 203 Ill. 543, 546-47, 68 N.E. 93, 94 (1903).

Petitioners argue that the marriage is void *ab initio*. During oral argument, petitioners' counsel alleged that there is a videotape of the ceremony that will demonstrate that decedent never consented to the marriage. They further contend that decedent was so infirm at the time of the ceremony that he was not consciously aware of his environment at the time of solemnization. He did not answer the officiate; another party kneeling next to him answered for him. He did not sign the marriage license; only respondent went to the county clerk's office to obtain the marriage license. Because of the condition of decedent and the fact there is evidence he did not participate in the solemnization, petitioners allege the marriage never existed and can be attacked in any proceeding, even after the death of the party. See *Barber*, 203 Ill. at 546-47, 68 N.E. at 94. Petitioners argue they are not limited to Part III of the Dissolution Act to challenge the validity of a marriage.

Respondent, on the other hand, argues that no matter how petitioners frame their argument, they are still challenging the validity of a marriage for lack of capacity. Respondent argues that the avenue the General Assembly enacted to pursue such an attack is Part III of the Dissolution Act and that, consequently, they are barred from asserting a cause of action because of the death of the husband. See 750 ILCS 5/302 (West 1996). Respondent concedes that while this result may seem harsh and/or unfair, the legislature has created the system and the courts cannot ignore the statutes. Respondent asserts that the only way to address the potential loophole is for the General Assembly to close it.

■ The key issue in this case is whether the marriage is void or voidable. A voidable marriage is one that is potentially invalid but, until it is judicially determined invalid, is completely valid for all purposes. See 52 Am. Jur. 2d *Marriage* § 105 (1970); 8 Ill. Jur. *Marriage & Dissolution* § 1:11 (1993). A void marriage is ineffectual to

alter the marital status of either party. No judicial proceeding or decrees are required to establish its invalidity. See 52 Am. Jur. 2d *Marriage* § 105 (1970); 8 Ill. Jur. *Marriage & Dissolution* § 1:11 (1993). The supreme court addressed this distinction in *Barber*:

> " 'A void marriage is a mere nullity, and its validity may be impeached in any court, whether the question arise[s] directly or collaterally and whether the parties be living or dead; but a voidable marriage is valid, for all civil purposes, until a competent tribunal has pronounced the sentence of nullity, upon direct proceedings instituted for the purpose of setting the marriage aside.' (Schouler on Domestic Relations,—2d ed.—p. 24.)" *Barber*, 203 Ill. at 546-47, 68 N.E. at 94.

Consequently, if a marriage is void *ab initio*, its validity is subject to attack in any proceeding in which the question of its validity arises, including actions in probate after the death of the incompetent party. See 36 Am. Jur. Proof of Facts 2d 441, § 1 (1983), referring to *Hunt v. Hunt*, 56 Tenn. App. 683, 412 S.W.2d 7 (1965); 52 Am. Jur. 2d *Marriage* § 21 (1973). To determine whether or not a marriage is void or voidable, the court must apply the facts of each case to the language of the applicable statute and determine whether the formalities of a marriage existed. See 36 Am. Jur. Proof of Facts 2d 441, § 1 (1983).

In this case, the trial court dismissed the petition for failure to state a cause of action, pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1996)). As such, the reviewing court must take all well-pleaded facts as true. See *Urbaitis v. Commonwealth Edison*, 143 Ill. 2d 458, 475, 575 N.E.2d 548, 555 (1991). The question is whether sufficient facts exist that could entitle petitioners to relief. See *Urbaitis*, 143 Ill. 2d at 475, 575 N.E.2d at 555. Petitioners allege that evidence exists which will support their contention that this marriage was, in essence, a proxy marriage and, therefore, never amounted to a legal union under the Dissolution Act.

Petitioners argue that a videotape of the ceremony will support their claim that the ceremony was not solemnized. Petitioners note that the decedent suffered from an inoperable brain tumor. He was not present when respondent obtained the marriage license, nor did he sign with his name. Decedent did not participate in the ceremony, and when the officiate asked for decedent to recite the marriage vow, a person kneeling next to him responded for him. Petitioners could present evidence indicating the possibility that the ceremony was a marriage by proxy; however, Does a proxy marriage refute the presumption of validity that Illinois confers upon marriages? If a marriage by proxy does refute the presumption, then petitioners have stated a cause of action.

■ A proxy marriage is defined as follows:

"A marriage contracted or celebrated through agents acting on behalf of one or both parties. A proxy marriage differs from the more conventional ceremony only in that one or both of the contracting parties are represented by an agent[,] all the other requirements having been met. *State v. Anderson*, 239 Or. 200, 396 P.2d 558, 561 [1964]." Black's Law Dictionary 1226 (6th ed. 1990).

The first time proxy marriages became an issue in the modern United States was during World War I. This was the first war in which large numbers of American men fought across great distances. Some servicemen wanted to be able to marry when they were stationed abroad. Because of this, various American states revived a practice recognized in the old continental law of Europe and in the American colonies through the old English common law.

Because our analysis goes back to the Middle Ages, we will discuss not only governmental law but also the influence of the Catholic Church on law and culture. The church traditionally insisted that the parties exchange consent face-to-face in the presence of the church and get their union blessed by the church. A failure to observe these requirements did not render the marriage void because Pope Innocent III accepted the Roman view that marriage could be consented to by messenger. See E. Lorenzen, *Marriage By Proxy & the Conflict of Laws*, 32 Harv. L. Rev. 473, 474-75 (1919).

Over time, the canon laws were superseded by the civil laws. The civil acts aimed to publicize marriages and ensure that marriages were voluntary and deliberate acts of the parties. See 32 Harv. L. Rev. at 477. Marriage by proxy violated the second objective of the civil marriage acts because there was no way to guarantee that a grant of proxy had not been revoked before the ceremony. France leaned against marriage by proxy, through the Napoleonic Code, which did not expressly outlaw proxy marriages but required both parties to be present so the officiate of the ceremony could review the rights and duties of husband and wife. Belgium adopted the Napoleonic Code, but Belgian writers stated that while the code implied a prohibition of marriage by proxy, a ceremony celebrated in such manner could be valid. See 32 Harv. L. Rev. at 478. Italy and Germany expressly outlawed proxy marriage except for their royal families. See 32 Harv. L. Rev. at 478. Austria also prohibited the practice except by government authorization. See 32 Harv. L. Rev. at 478. In 1916, during World War I, Belgium, France, and Italy all authorized marriage by proxy. All three decrees mentioned the intent of the acts to allow soldiers abroad to marry. See 32 Harv. L. Rev. at 479.

As for the European country most influential on American juris-

prudence, England, marriage by proxy was incompatible with English law at the beginning of the twentieth century. See 32 Harv. L. Rev. at 480. The Marriage Act of 1898 prescribed that the parties recite their consent vow in the presence of the registrar or authorized person and multiple witnesses. See 32 Harv. L. Rev. at 480. However, the English law that influenced American jurisprudence was in existence during the colonial period in which marriage by proxy was accepted. See 32 Harv. L. Rev. at 480. With the Reformation, the king's ecclesiastical law equaled or superseded canon law; however, no change on this issue occurred, and canon law's acceptance of marriage by proxy continued in force in England until the eighteenth century. See 32 Harv. L. Rev. at 480-81.

Proxy marriage was accepted by Roman law, canon law, and ecclesiastical law, but did the policy purposes behind marriage through an agent apply to the American colonies? See 32 Harv. L. Rev. at 482. The conditions the American colonists faced clearly established an ideal situation and need for proxy marriages. Colonists sent to establish a new settlement were often men, and these men left their future brides behind. Thus, the colonists, similar to soldiers serving abroad, had a desire and a need for marriage by proxy. See 32 Harv. L. Rev. at 482. Since marriage by proxy was accepted under English law and accepted on the continent for situations similar to those facing the colonists, marriage by proxy must have existed at common law. See 32 Harv. L. Rev. at 483. This is consistent with the Illinois Supreme Court's assessment that proxy marriage is valid in states still allowing common law marriage. See *Jambrone*, 16 Ill. 2d at 35, 156 N.E.2d at 570.

In 1943, the Illinois Attorney General addressed the issue of proxy marriages. The Attorney General noted that the issue arose from the fact that American servicemen were stationed throughout the world and marriages in person were sometimes impossible. The marriage relationship is controlled by public policy consideration because of the importance marriage holds in our society. See 1943 Ill. Att'y Gen. Op. 119. The Attorney General opined that because Illinois outlawed common law marriage in 1905 and required both parties to apply for a license in the county clerk's office in person, the question of proxy marriages was an academic inquiry. See 1943 Ill. Att'y Gen. Op. 119. The Attorney General acknowledged the origins discussed above and recognized that old English common law transferred to America during the colonial period permitted marriage by proxy. See 1943 Ill. Att'y Gen. Op. 119. However, because common law marriages were outlawed in Illinois, the Attorney General did not envision a situation where a court would uphold the validity of a marriage between two persons

who fulfill the requirements of solemnization and registration but fail to appear in front of the county clerk. The opinion does not answer the question before us but does indicate the negative attitude developed against proxy marriages in modern law.

With this historical perspective indicating a steady trend toward looking on marriage by proxy with disfavor, we shall examine the statute and attempt to ascertain the legislative intent and the public policy driving said intent. The current Dissolution Act was enacted after looking to the Uniform Marriage and Divorce Act (hereinafter the Uniform Act) for guidance. Some parts are identical, some are different, and as is the case with section 209 of the Dissolution Act, part is taken from the Uniform Act and part is independent of it. The question before us requires an analysis of statutory construction and how the interaction of these two marriage acts reveals the legislative intent toward marriage by proxy.

■ A review of statutory construction is conducted *de novo*. See *Lucas v. Lakin*, 175 Ill. 2d 166, 171, 676 N.E.2d 637, 640 (1997); *Davis v. Temple*, 284 Ill. App. 3d 983, 989, 673 N.E.2d 737, 741 (1996). The purpose of the Dissolution Act is to promote the underlying purposes of the Act, which are (1) to provide adequate procedures for the solemnization and registration of marriage, (2) to strengthen and preserve the integrity of marriage, (3) to promote the amicable settlement of disputes, (4) to mitigate the potential harm to spouse and children arising from dissolution, (5) to make reasonable provision for spouse and children during and after litigation, (6) to eliminate the consideration of marital misconduct in the adjudication of legal dissolution, (7) to secure the maximum involvement and cooperation of both parties in their children's lives, and (8) to make provisions for the preservation of assets during the litigation. The Act itself is to be liberally construed so as to achieve these stated goals. 750 ILCS 5/102 (West 1996).

■ ■ The controlling aspect of this dispute is whether the requirements of solemnization were achieved by decedent's representative at the ceremony. Section 209 of the Dissolution Act addresses solemnization. 750 ILCS 5/209 (West 1996). This section is substantially similar to section 206 of the Uniform Act (Uniform Marriage & Divorce Act, 9A U.L.A. 182 (1973)). Section 206(b) specifically addresses the issue of marriage by proxy and permits such action. Uniform Marriage & Divorce Act, 9A U.L.A. 182 (1973). In this section's comments, it is noted that the authors saw no reason to outlaw marriage by proxy. Uniform Marriage & Divorce Act, 9A U.L.A. 183, Comment (1973). Section 209 of the Dissolution Act is identical to section 206 of the Uniform Act except that sections b and c of section 206 are not

included in the Illinois statute. In fact, section a is identical except for the fact that at the end of the paragraph, section 209 states:

"Either the person solemnizing the marriage[ ] or, if no individual acting alone solemnized the marriage, *both parties* to the marriage[ ] shall complete the marriage certificate form and forward it to the county clerk within 10 days after such marriage is solemnized." (Emphasis added.) 750 ILCS 5/209(a) (West 1996).

In contrast, section 206(b) states:

"Either the person solemnizing the marriage[ ] or, if no individual acting alone solemnized the marriage, *a party* to the marriage[ ] shall complete the marriage certificate form and forward it to the [marriage license] clerk." (Emphasis added.) Uniform Marriage & Divorce Act, 9A U.L.A. 182 (1973).

Clearly, the General Assembly took every precaution within reason to emphasize its intent for a marriage to occur with both parties present and actively involved.

Finally, the most persuasive indication that the General Assembly did not intend to recognize marriage by proxy comes from a reading of the Historical and Practice Notes to the Illinois Marriage and Dissolution of Marriage Act adopted in 1977. The notes state that section 209 of the Act was adopted "with minor changes" from sections 206(a) and (d) of the Uniform Act. Ill. Ann. Stat., ch. 40, par. 209, Historical & Practice Notes, at 43 (Smith-Hurd 1980). They address the exclusion of the marriage-by-proxy section.

"Under this Act solemnization remains essential to a valid marriage in Illinois. The provision for solemnization of proxy marriages contained in sections 206(b) and 205(c) of the Uniform Act has been omitted from the Illinois Act, consistent with prior Illinois law. 1943 Op. Atty. Gen. No. 245 (Ill. 1943)." Ill. Ann. Stat., ch. 40, par. 209, Historical & Practice Notes, at 44 (Smith-Hurd 1980).

What we have before us is a unique situation that the legislature never envisioned. With the augment of radically advanced medical treatment, people are living longer. As a result, situations arise where a person is bedridden and may still live for a significant period of time and wish to take a companion. This court is not attempting to negate any voluntary and legitimate marriages under these circumstances; however, the infirm state of one of the parties allows others to take advantage of him or her. Additionally, the General Assembly did not foresee the standing issue, because if a person did not consent to his or her marriage, one would expect that person to challenge the marriage immediately, especially if that person was present at the service. However, in this case the party whose consent is in question was mute and barely conscious at the ceremony and died shortly thereafter.

1178

The legislature did not intend to permit marriage by proxy. The legislature would frown on a marriage being solemnized where only one party obtained the marriage license, only one party spoke or acknowledged the vows in any manner at the ceremony, and a representative spoke for the other party with no evidence of a written proxy authorizing said representative. This is not a case analogous to proxy marriage during war time. This case represents a unique situation that warrants considering whether the marriage is void *ab initio* or merely voidable. Petitioners have standing to challenge said marriage in any proceeding. Thus, the trial court incorrectly held that the petition failed to state a cause of action.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

HOPKINS and KUEHN, JJ., concur.