INEZ D. YSERN, an infant, by Agnes S. Ysern, her next friend, petitioner,

*v.*

GEORGE HORTER, defendant.

[Decided February 25th, 1920.]

1. An unconsummated marriage which is infected with fraud of any kind whatsoever, which would render a contract voidable, is voidable at the option of the injured party, if promptly disaffirmed before any change of status has occurred.

2. In a suit for annulment of marriage where it appeared the marriage was not consummated, the petitioner was of immature mind, and disaffirmed the marriage within a reasonable time, and where the defendant grossly misrepresented his moral character and habits, whereby he induced the defendant to marry him, there is sufficient fraud to warrant an annulment of an unconsummated marriage, and under the circumstances such annulment will not be against sound considerations of public policy.

On petition for annulment of marriage, and report of Special Master Rosenberg, with depositions.

*Mr. William M. Rysdyk,* for the petitioner.

STEVENSON, V. C.

This is an *ex parte* suit for the annulment of a marriage on the ground of fraud brought under the general equity jurisdiction of the court, the procedure, however, being now the same as in suits brought under the statute. *P. L. 1916 p. 102.* It was unnecessary that the petitioner should sue by a next friend, inasmuch as she was over sixteen years of age. *P. L. 1915 p. 539.* The form of suit which was adopted, however, seems to be still permissible.

1. The master reports that the petitioner, at the time of the marriage, was an infant eighteen years of age and was at that time still attending, or had only recently left, school; that she had known the defendant for only two or three weeks before the ceremony of marriage; that he had represented himself as being a person of good moral character; that after the ceremony the parties went to a hotel in New York City; that the defendant began drinking very heavily, and that in the privacy of their room in the hotel he told his young wife of his gross immoralities with women, stating that he had "seduced other girls;" that the petitioner thereupon refused to permit the defendant to have sexual intercourse with her, and that after two or three days of absence in New York with the defendant, during which time he exhibited himself to her as a most repulsively immoral man, if not a degenerate, she returned to her mother's home in New Jersey, the marriage not having been consummated. The report of the master upon the facts is fully sustained by the depositions.

The learned master sums up his findings in the case by the enumeration of its essential elements as follows: "(1) fraud; (2) want of consummation of the marriage; (3) immaturity of mind of the petitioner, and (4) disaffirmance of the contract within a reasonable time."

The case comes before me for a review of the master's report upon a special order of reference made by the chancellor.

The master basis his recommendation that a decree of nullity be granted to the petitioner upon the authority of the case of *Cox* v. *Cox,* a similar *ex parte* suit for annulment of marriage, decided by me in 1909, but not at the time reported, or intended to be reported. Three years later Mr. Biddle procured a memorandum of my decision, which I had dictated for my own use, and the same was published, inadvertently, without revision, in an appendix to the second edition (1912) of his book on *New Jersey Divorce Practice.* This memorandum, while it contains some expressions which would have been eliminated if I had not neglected to revise it, sets forth principles of the Divorce law of New Jersey which I think, after further study of the subject, are sound and controlling in this present case. So far as I am aware, the *Cox Case* and this present case are the only cases in New Jersey in which the wide distinction between a consummated marriage and an unconsummated marriage in a suit for annulment on the ground of fraud has been considered. In other jurisdictions where unconsummated marriages have been brought in question, the significance of this distinction seems to have been ignored or only partly recognized. *Robertson* v. *Cole, 12 Tex. 356; Lyndon* v. *Lyndon, 69 Ill. 43.* Mr. Bishop (*1 M., D. & S.* § *462*) states that at the time when he was writing (1891) there were "perhaps no specific rulings of a bench of judges" upon the status of unconsummated marriages tainted with fraud, and he adds:

"There are cases in which the distinction between marriage consummated and not consummated would have been important, but it was not suggested by counsel and did not occur to the unaided thoughts of the judges.

"Thus, before the Iowa court there was a case of gross fraud such as would have annulled any other contract, wherein the woman took the alarm before copula, but the attention of the court was not directed to the element of non-consummation and the case went against her, on the ordinary reasoning as applied to marriage consummated. [Citing *Weir* v. *Still, 31 Iowa 107.*] The books of reports as to other subjects are full of cases like this, which are regarded no otherwise than as if the unthought-of fact did not exist."

No doubt the distinction under consideration owes its great importance to the fact that our law takes no cognizance of marriage "in respect to some mysterious religious effect produced by the benediction of a priest." *1 Bish. M., D. & S. § 461.* When we look at marriage from the legal point of view, without regard to any religious doctrines, it seems plain that all those peculiar characteristics of divorce and nullity suits which should never be lost sight of—the establishment of the home, the interests of children which have been born or may be born, the protection of the morals of society and the decencies of life— generally appear only after the marriage has been consummated. It may be conceded that after a man and woman have appeared before a magistrate or a priest in the presence of witnesses, and the ceremony of marriage between them has been solemnized in accordance with their mutual consent without the slightest taint of fraud, duress or mistake in the transaction, public policy, the interests of society, will not permit the parties even before the consummation of the marriage to have the marriage annulled simply because they have changed their minds.

For the purpose of this present case I think that it is safe to reaffirm and apply the principle which I endeavored to formulate in the *Cox Case,* to the effect that "an unconsummated marriage which is infected by fraud of any kind whatsoever which would render a contract voidable, is voidable, at the option of the injured party, if promptly disaffirmed before any change of status has occurred." It may seem to some minds that the fraud, inducing consent to marriage, should be defined with some limitations which do not apply to ordinary contracts. It may also be that, whatever more accurate definition of the rule may be made in the future, it will be extended to cases of consummated marriage, where the parties have separated and where there are no home and no child to protect. However this may be, I do not think that any definition of the principle will be formulated which will not include within its beneficent application the gross and scandalous instance of fraud upon a girl eighteen years of age, which is presented in this case.

2. The jurisdiction of the New Jersey court of chancery, independent of any statute, to annul a marriage on the ground

of fraud, want of mutual consent, duress, &c., has been established beyond controversy, and it is unnecessary to discuss the logical basis, if there is one, of such jurisdiction.  *Carris v. Carris (Court of Errors and Appeals, 1873), 24 N. J. Eq. 516; Vanderbilt* v. *Mitchell (Court of Errors and Appeals, 1907), 72 N. J. Eq. 910, 918; Crane* v. *Crane (Chancellor Magie, 1901), 62 N. J. Eq. 21; Bolmer* v. *Edsall (Chancellor Walker, 1919), 90 N. J. Eq. 299; Davis* v. *Davis (Vice-Chancellor Lane, 1919), 90 N. J. Eq. 158.*

The only question in a case like this is whether the fraud proved is "sufficient" to warrant the court in annulling the marriage.  Before considering the definitions, so far as there are any, of the exact nature and extent of the fraud which must be found in order to warrant a decree of annulment of an unconsummated marriage, it may be well to examine and consider the English system of divorce and annulment, because the English cases have laid down propositions which have been repeated in American cases without the slightest recognition of the wide difference between the two systems of divorce and annulment law which obtain, respectively, in England and in the United States:

(1) The English court of chancery has no original jurisdiction over divorce or annulment of marriage, and no jurisdiction of those subjects has ever been vested in it by act of parliament. Prior to 1857, when "The Court for Divorce and Matrimonial Causes" was established by act of parliament, limited divorces and decrees for the annulment of marriage were within the exclusive jurisdiction of the ecclesiastical courts, while parliament had power which it frequently exercised of granting divorces dissolving marriages by statute.  Undoubtedly, parliament also had the power, if it saw fit to exercise it, of annulling marriages, *i. e.*, declaring them void *ab initio*.

When the English divorce court was established by parliament in 1857 the entire jurisdiction of the ecclesiastical court in divorce and nullity cases was vested in this new tribunal.  In addition to exercising the functions of the ecclesiastical courts in divorce and nullity cases, the new court had vested in it by

the statute which created it jurisdiction to .grant absolute divorces in certain cases.

It will be observed that this English divorce court, which is now the "Probate and Divorce Division of the High Court of Justice," had no original equity jurisdiction, nor was any such jurisdiction vested in it by statute. The new court merely took the place of the ecclesiastical courts and, in addition, exercised a strictly statutory jurisdiction which was limited to certain special cases.

When we come to examine how the ecclesiastical courts and the new probate and divorce court to which the jurisdiction of the ecclesiastical courts in matrimonial causes was transferred regarded fraud in its relation to marriage, we find it well established that the fact that the consent of the complaining party had been obtained by fraud and imposition, or even gross fraud and gross imposition, was entirely immaterial. Fraud in certain cases was held to establish a want of consent, as in the case of fraudulent impersonation, but the annulment of the marriage in such case was not rested upon fraud but upon the lack of consent. The English law on this subject is well summed up in the case of *Moss* v. *Moss, L. R.* [*1897*] *P. 263* (at *p. 269*), as follows: "When there is consent, no fraud inducing that consent is material. Lord Stowell has at least three times expressed this in the most emphatic language. In *Wakefield* v. *Mackay, 1 Phil. 134*, that learned judge said: 'Error about the family or fortune of the individual, though procured by disingenuous representations, does not at all affect the validity of the marriage;' in *Ewing* v. *Wheatley, 2 Hagg. Cons. 175, 183:* 'It is perfectly established that no disparity of fortune or mistake as to the qualities of the person will impeach the 'vinculum of the marriage.' And in *Sullivan* v. *Sullivan, 2 Hagg. Cons. 238, 248:* 'The strongest case you could establish of the most deliberate plot leading to a marriage the most unseemly in all disproportions of rank, of fortune, of habits of life, and even of age itself, would not enable this court to release him from chains which though forged by others he had riveted upon himself. If he is capable of consenting, and has consented, the law does not ask how the consent has been induced.' "

These harsh propositions are absolutely inconsistent with the law of New Jersey, as laid down in the case of *Carris* v. *Carris, supra,* and later reported cases. *Carris* v. *Carris* and other American cases were cited in the argument of *Moss* v. *Moss,* and were criticised. The English court disapproved of the American cases and declined to follow them. *Moss* v. *Moss,* was practically on all-fours with *Carris* v. *Carris.* The two cases are in flat contradiction and distinctly illustrate the difference between the American and the English law on this subject of fraud as a basis of annulment of marriage.

In the case of *Dickinson* v. *Dickinson, L. R.* [*1913*] *P. 198,* the English divorce court had to deal with a case of willful and persistent refusal on the part of the wife to allow any marital intercourse. The evidence showed, I think distinctly, that the defendant, the wife, prior to the marriage, resolved that she would not permit the marriage to be consummated, and took measures to prevent such a thing from occurring. The evidence seems to be entirely insufficient to show that the unfortunate husband, the complainant, had any knowledge of this intention on the part of his wife. There seems also to have been ground (as I think there was in the case of *Raymond* v. *Raymond,* '79 *Atl. Rep. 430*) for holding that there was a presumption established by the evidence, rebuttable, of course, that the defendant intended at and before the time of the marriage ceremony to adopt the line of conduct which, in fact, afterwards she pursued, cohabitation apparently having followed immediately after the ceremony.

The significant fact, however, is, that the learned English judge took no notice of the presumption or the proof of fraudulent concealment prior to the marriage, followed up by persistent refusal of intercourse after the marriage, because no kind of fraud, as we have seen, is of any avail in an English court to annul a marriage to which the parties have given their consent. The case on the facts is in distinct contradiction to *Bolmer* v. *Edsall, supra.* In this *Dickinson Case,* however, a decree of nullity was granted, based solely upon the wrongful conduct of the defendant subsequent to the marriage.

In the later case of *Napier* v. *Napier, L. R.* [*1915*] *P. 65,* the same divorce judge, Sir Samuel Evans, admitting that in his decision of the *Dickinson Case* he had "gone further than any of his predecessors in granting relief," nevertheless, reaffirmed the doctrine which he had laid down, and held that in the case before him that "doctrine did not apply, because the facts were very different, and particularly because the petitioner had not made reasonable or any real attempts to consummate the marriage."

The court of appeal, however, *L. R.* [*1915*] *P. 184,* in reviewing the decision in this *Napier Case,* unanimously overruled the whole doctrine laid down in the *Dickinson Case,* holding that the court was confined, in nullity cases, to those grounds for relief which had been established in the ecclesiastical courts. Lord-Justice Pickford in his opinion ( at *p. 197*) states: "It cannot, I think, be doubted that the ecclesiastical courts never accepted non-consummation as a ground for nullity unless it could be referred to impotence or incapacity existing at the time of the marriage.   *   *   *   Willful and wrongful refusal, not arising from an antecedent incapacity, is a matter arising after marriage. It would not have been a ground of nullity in the ecclesiastical courts, and, therefore, cannot be so now."

Here, again, we have the English judges ignoring the fact of a fraudulent concealment before marriage of a deliberate intention not to have the marriage consummated, for the manifest reason that no fraud of any kind whatever if there has been actual consent, even though such consent be induced by the fraud, can ever be made the basis of a decree of nullity in an English court. These English judges indicate distinctly that they consider that the remedy of the defrauded spouse in cases of this character must be obtained from parliament.

(2) While it is unnecessary to undertake by any argument to sustain the wide jurisdiction of the New Jersey court of chancery of suits for annulment, on the ground of fraud and on other grounds, it is perhaps worth while to point out one or two respects wherein our New Jersey court for the determination of matrimonial causes differs from the corresponding court in England. We have seen that the English divorce court is a

statutory court with a limited jurisdiction and without any general equity powers. On the other hand, from the start, in New Jersey, in New York, and in other states, jurisdiction of matrimonial causes was vested in an existing court of extensive equity jurisdiction. The legislation in New Jersey in 1794— our first divorce act—may be regarded as effecting a mere extension of the equity powers of the court to a new subject.

In *Wightman* v. *Wightman (1820), 4 Johns. Ch. 343, 345,* Chancellor Kent recognized distinctly that in the absence of ecclesiastical courts, and also in the absence of any legislation on the subject, the power to provide the remedy of annulment was "necessarily cast upon the court of chancery which had, by statute, jurisdiction over the marriage contract in certain specified cases."

(3) It is also of importance to note that the English probate and divorce court, in limiting its jurisdiction strictly to that of the ecclesiastical courts and the additional jurisdiction conferred by statute, always has had in view the power of parliament to grant divorces and to annul marriages in cases of hardship, which do not come within the strict letter of the law which the court can recognize and enforce. Since 1844 there has been no such legislative tribunal in New Jersey, so, that if the court of chancery cannot grant relief the complainant, though suffering from a great grievance and hardship, is remediless.

(4) Is it not plain that the court of chancery of New Jersey should be extremely cautious in applying propositions laid down by the English divorce courts, which limit the power of the court to grant relief of annulment of marriage in cases of fraud? The proposition repeated from the English decisions in *Carris* v. *Carris, supra,* and other New Jersey cases, to the effect that fraud in misrepresentation of rank, fortune, &c., affords no ground for annulment, must be considered in view of the fact that no fraudulent representations of any kind availed in an English court to annul a marriage where consent was proved, notwithstanding there had been no consummation. The fact that the consent was induced by fraud was immaterial.

(5) The question now arises, What is the correct definition of the nature and degree of fraud which, under our New Jersey

authorities, beginning with *Carris* v. *Carris, supra,* will warrant
a decree of annulment of marriage? The *Carris Case* held, in
effect, that the court of chancery had jurisdiction to annul a
marriage on the ground of fraud in respect to the "common law
essentials" of the marriage when such decree "would not be
against sound consideration of public policy." The proofs in
the case showed that the defendant fraudulently concealed her
pregnancy at the time of marriage when the husband had had
no connection with her and was ignorant of her unchastity, and
that, subsequently, a child was born, and that the petitioner left
his wife as soon as the fraud was discovered. This fraud was
held to relate directly to the "essentials" of the marriage. The
marriage, therefore, was annulled, the court evidently consider-
ing that there was no objection based on public policy. The
important fact to bear in mind in considering the authority of
this *Carris Case* is, that the marriage had been consummated
and the effect of the decree was to bastardize a child born in
wedlock.

The gist of the decision in the *Carris Case* is tersely stated by
Chancellor Walker in the case of *Bolmer* v. *Edsall, 90 N. J. Eq.
299, 300,* as follows: "The court of errors and appeals held that
the court of chancery, under its general power to annul fraudu-
lent contracts, has jurisdiction to annul a contract of marriage
for *sufficient* fraud" (italics mine). What is fraud in respect
to the "essentials" of marriage, or, to use the broader term, what
is "sufficient fraud," I think remains to-day the subject of ascer-
tainment in every case brought before this court in which the
complaining spouse alleges that his or her consent to a marriage
was induced by the defendant's fraud.

No decree, however, it seems to me, can be based on the au-
thority of the deliverance of the court of errors and appeals
through Mr. Justice Bedle in the case of *Carris* v. *Carris* with-
out keeping in mind the fact that the case before the court was
one where the marriage had been consummated and the interests
of a child as well as perhaps the proprieties of social life were
involved. It is quite plain, I think, that the court did not have
in mind and had no occasion to consider in any way the status

of an unconsummated marriage with respect to a fraud which induced it.

In the case of *Bolmer* v. *Edsall, supra,* the marriage of the petitioner was annulled on the ground that the defendant before the marriage determined that she would not submit to sexual intercourse after marriage, which intention she actually carried out after marriage by persistent refusal. There was no consummation, and, plainly, the defendant's fraud related directly to an "essential" of the marriage relation. There was no occasion, however, for any discussion of the distinction between a consummated and an unconsummated marriage, and there was nothing about the case to bring the distinction to the mind of the chancellor.

We have to deal in this case with a fraud which did not consist in a concealed intention before marriage not to submit to sexual intercourse, followed after marriage by persistent refusal, but with a fraud of a very different character—a fraud consisting of gross misrepresentations made by the defendant in regard to his moral character and practices whereby he induced the petitioner to marry him. It would seem that, if the petitioner's case is to find support in *Bolmer* v. *Edsall,* we must adjudge that the defendant's misrepresentations constituted a "sufficient fraud" to warrant a decree of annulment. If a decree of annulment in favor of the petitioner can be based upon the authority of *Carris* v. *Carris,* it would seem that we must adjudge that the defendant's fraud must pertain to the "common law essentials," or, at any rate, to an essential element of the marriage. With the exclusion of fraudulent representations as to rank, moral character, &c., by the English courts which reject or ignore nonconsummation as a material fact in annulment cases, we should be obliged to determine the question above stated, namely, whether the fraud in this case with respect to the annulment of the marriage is to be put in the same class with the fraud proved in the *Carris Case* or the *Bolmer Case.*

It may be noted in passing that the fraud proved in the present case was discovered immediately after the marriage ceremony, and that within three days the petitioner permanently

separated herself from the defendant and promptly disaffirmed the marriage before any consummation had been effected.

In *Davis* v. *Davis, supra,* the marriage was annulled on the ground of fraudulent concealment by the defendant before marriage of the fact that he was suffering from tuberculosis. The marriage had been consummated; the parties had lived together as husband and wife for six months and a child had been born which, however, lived only a few days. The surmise is unavoidable that if the petitioner had stood before the court as the mother of a family of children of which the defendant was the father, the court would not have found it so easy to reach the conclusion that there were no considerations opposed to annulment based on "good policy, sound morality and the peculiar nature of the marriage relation."

I have not been able to find a report of any New Jersey case in which there is any discussion of the distinction between a consummated marriage and an unconsummated marriage, in suits brought under the general equity jurisdiction of the court of chancery, to annul a marriage on the ground of fraud. There is an incidental allusion to this distinction in *Davis* v. *Davis, supra*—a case, as we have seen, where the marriage had been consummated and a child had been born.

(6) We have, therefore, presented in this case a fact, it seems to me, of very great importance which has never received any consideration in our New Jersey cases which have dealt with the effect of fraud upon marriage. The case of *Carris* v. *Carris,* according to the well-settled principle of American and English jurisprudence, is a binding authority upon this court only in similar cases where the marriage has been consummated. The mere statement of the proposition established by the *Carris Case* will show how remote that case is from the one now before this court and how dangerous, therefore, it would be to adopt and apply to this case *dicta* contained in the opinion in the *Carris Case*. The proposition established by the *Carris Case* seems to be this: That a consummated marriage, even where subsequently a child has been born which the decree will bastardize, may be annulled on the ground of fraud, consisting of the concealment by the defendant, the wife, of her pregnancy by another

man, such fraud being deemed to relate to the "common law essentials" of the marriage, and the annulment of the marriage not being against "sound considerations of public policy," and the complainant, the husband, not having had antenuptial intercourse with the defendant, the wife. There was no consideration and no reason to consider the question whether an unconsummated marriage might be annulled where the consent had been induced by a different species of fraud from that which was established in that case.

So far as the question has been discussed in reported American cases in other jurisdictions and by the text-writers, I find substantial agreement to the effect that an unconsummated marriage is little more than an engagement to marry—that there is no reason based on public policy why, for instance, a young girl should be tied forever to an escaped criminal simply because of a ceremony of marriage to which she was induced to consent by a fraudulent representation by her spouse that he was a person of good character, respectable standing in society and of large fortune. Take the case which has so often occurred in this country: A foreigner of engaging manners represents himself to be a nobleman of high standing in society with a large fortune. In fact, he is of low birth, a social outcast, living on his wits. On the strength of these inducements he persuades an innocent young girl to marry him and persuades the parents of the girl to consent to the ceremony. Before the marriage is consummated the fraud is discovered. The parents intervene and the young girl disaffirms the marriage and promptly sues for its annulment. What has the case of *Carris* v. *Carris* in common with such a case? Is it not plain that in determining what is "sufficient fraud" to annul a marriage regard must be had for the whole status of both parties? If the wife be the complainant, her age, character and the degree of maturity of her mind should be considered. Above all, it seems to me, it is important to ascertain whether the case presents merely an instance of the utterance of a few words expressive of a consent to a marriage, or such words have been followed by sexual intercourse, cohabitation and the creation of a status involving the interests of children and the preservation of the morals of so-

ciety. If the petitioner, in this present case, instead of being a pure young girl were a woman of mature years, addicted to drink and with a past career in a measure corresponding with that of the defendant, there certainly would be room to question whether "sufficient fraud" had been proved to warrant a decree of annulment, even although there had been no consummation and no change of status.

The following are authorities which I think sustain the view of the effect of fraud upon an unconsummated marriage hereinbefore expressed:

"Though marriage becomes valid before consummation, still the non-consummated status, wherein unborn children and the community have not yet acquired the specially grave and weighty interests, is very different from the consummated one. So, that no principle appears—not now inquiring how the authorities are—which would justify a court in refusing to pronounce void the non-consummated marriage for ordinary fraud." *1 Bish. M., D. & S. § 456.*

See subsequent sections.

"Before consummation, the parties stand upon almost the same footing as the parties to an ordinary fraud. * * *
"Where there has been no consummation, any fraud which would be sufficient to annul a contract should in reason be sufficient to annul a marriage ceremony. No satisfactory reason of the law will justify the courts in declaring valid such a contract of marriage when tainted with fraud or duress, where the only effect will be the punishment of the innocent and the confiscation of his or her property by the deception. If the marriage is declared valid, it will exist in name only, preventing both parties from marrying again and bringing the marriage relation into disrepute. Every reason for relief from fraud is applicable here, where a denial of relief is fraught with evil consequences much greater than those flowing from ordinary contracts." *Nels. D. & S. § 602.* See, also, sections 603 to 612, inclusive.

The same doctrine is stated with citation of authorities in that excellent digest—*19 Am. & Eng. Encycl. L. (2d ed.) 1184.*

In *Vondal* v. *Vondal (1899), 175 Mass. 383,* the Massachusetts court considered the effect upon a marriage induced by fraud consisting in the concealment of disease. While the case seems to be in conflict with the New Jersey cases (*Crane* v. *Crane* and *Davis* v. *Davis, supra*), it will be observed the dis-

tinction between a consummated and an unconsummated marriage is plainly in the mind of the court, and the proposition enunciated is that the concealed existence of disease "is not a sufficient ground for a decree of nullity of marriage   \*   \*   \* which has been consummated." See, also, *Smith* v. *Smith* (*1898*), *171 Mass. 404, 409; Anders* v. *Anders* (*1916*), *224 Mass. 438.*

*Svenson* v. *Svenson* (*1904*), *178 N. Y. 54.* This was a case of fraudulent concealment of a disease, practically the same case as that which was presented to this court in *Crane* v. *Crane, supra.* The decision is based upon the doctrine stated by Mr. Bishop and Mr. Nelson, as above set forth. Many cases are cited and discussed. Judge Martin in his opinion (at *p. 61*) says: "It is evident that the marriage not having been consummated the usual considerations of public policy which apply to a case where the relation has, by consummation of the marriage ripened into a public status, do not exist here."

See, also, *Di Lorenzo* v. *Di Lorenzo* (*1903*), *174 N. Y. 467, 472.*

In considering the force and effect of the decisions in other states where there are statutes giving the courts power to annul marriages on the ground of fraud, as has been the case in New York, since the adoption of the revised statutes in 1829, it must be borne in mind that those statutes, so far as I have examined them, are general and do not undertake to define what is "sufficient" fraud to warrant an annulment of marriage. The whole matter of the sufficiency of the fraud and its definition with respect to consummated and unconsummated marriage is left open for the courts to determine. The cases, therefore, which recognize the force of the distinction which we are considering should, I think, be received as having great weight in New Jersey. In New Jersey, and in New York prior to 1829, the court of chancery exercised original jurisdiction to annul marriages on the ground of fraud. In New York since 1829, and I think in many other states, general legislation purporting to confer jurisdiction of annulment in cases of fraud places the courts practically in the same position as that which the court

of chancery of New Jersey occupied after the decision in the *Carris Case.*

(7) My conclusion on the whole case, is, that it is unnecessary to determine whether the defendant's fraud related to a "common law essential" of the marriage. I know of no authority for the proposition that such an inquiry must be made except in cases where the marriage has been consummated, and in the leading case (*Carris* v. *Carris*) in which such inquiry was adjudged necessary, not only had the marriage been consummated, but a child had been born whom a decree of nullity would bastardize. It would be rash for me to undertake—unnecessarily, I think, for the purposes of this case—to define a term of somewhat vague import which so far has been left undefined. If the common law "essentials" of a marriage consist exclusively of marital intercourse, and the incidents which usually follow, such as the establishment of a home and the birth of children, it certainly may be argued with force that the fraud proved in the present case did not relate to an "essential" element of the petitioner's marriage. Possibly, if the phrase under consideration is retained, the "common law essentials" of a consummated marriage may be defined within narrower limits than the "common law essentials" of an unconsummated marriage.

For all present purposes I think it is enough to find, as I do, that the evidence in this case exhibits (1) a *"sufficient fraud"* to warrant the annulment of (2) an *unconsummated marriage,* and that (3) such annulment, under the circumstances, will not be "against sound considerations of public policy."

The petitioner upon discovery of the fraud having promptly disaffirmed the marriage and brought this suit before any change of status of either party had occurred, a decree of nullity will be advised.

I am authorized by the chancellor to state that he concurs in this opinion.