895 A.2d 506

IN THE MATTER OF THE ESTATE OF MANUEL SANTOLINO.

Superior Court of New Jersey
Chancery Division Probate Part
Union County

Decided July 6, 2005.

568

*Peter R. Bray,* for petitioner Lillian Ex Centeno (*Bray, Chiocca & Miller, attorneys*).

*Alberto Ulloa,* for respondent Mercedes Santolino (*Andrea N. Mazzula,* on the brief).

LYONS, P.J.Ch.

The issue before the court is may a court annul a marriage after the death of one party to the marriage. The petitioner, Lillian E. Centeno, filed a verified complaint for letters of administration upon the death of Manuel Santolino, the decedent. The petitioner is the wife of Manuel Santolino.

The decedent and the petitioner first met in January 2000, when the petitioner moved into the decedent's home as a tenant. On or about March 11, 2004, the decedent was admitted to Trinitas Hospital. During his hospitalization, he was diagnosed with lung cancer. He was released from the hospital on April 1, 2004, at which time he returned to his Elizabeth residence. The petitioner and the decedent were married on April 27, 2004, in the Elizabeth Municipal Court. At the time of the marriage, the decedent was eighty-one and one-half years old, and the petitioner was forty-six years old. He was readmitted to Trinitas Hospital on May 11, 2004, where he expired on May 20, 2004. No will of the decedent has ever been found.

Decedent's heir is his sister, Mercedes Tabor, the respondent.[1] The Respondent filed a caveat against letters granting administration. Respondent claims that the marriage to the petitioner is a nullity pursuant to *N.J.S.A.* 2A:34–1. In particular, the respondent alleges that the decedent at the time of the marriage was impotent; the decedent lacked capacity to marry due to want of understanding because of mental condition; there was fraud as to the essentials of marriage; and there exist reasons allowable under general equity jurisdiction to nullify the marriage. Counsel for the petitioner has filed the instant motion to dismiss under *R.* 4:6–2(e) claiming that the respondent lacks standing to question the validity of the marriage, and that the claim as to the validity of the marriage does not state a cause of action since the death of the decedent terminated the marriage, and the validity of the marriage, therefore, can no longer be questioned.

The only reported decision concerning this issue is *In re DeConza's Estate,* 13 *N.J. Misc.* 281, 177 *A.* 847 (Orphan's Ct.1935). In *DeConza,* the decedent's widow applied for administration and a caveat was filed by the decedent's sister claiming the marriage was void because of decedent's lack of mental capacity to contract a marriage. The contested administration was heard by the Orphan's Court, whose opinion is not binding on this court. *See State v. Moody,* 169 *N.J.Super.* 177, 178, 404 *A.2d* 370 (Law Div.1978); *State v. Lopes,* 289 *N.J.Super.* 460, 477, 673 *A.2d* 1379 (Law Div.1995). The court found that the 1931 statute on annulments altered the common law and it made a marriage, even one where one of the parties is incapable mentally of consenting, voidable, not void. Hence, the court held that it would not look into allegations of a voidable marriage after the death of one of the parties to the marriage. The annulment statute at issue was enacted in 1971 and no subsequent cases in this state were

---

[1] Mr. Victor Tabor, nephew of the deceased and son of the respondent has been appointed guardian for his mother and as such has assumed the prosecution of this matter.

reported that discuss the issue at hand. It is appropriate, therefore, for this court to consider the issue anew.

Petitioner concedes solely for the purposes of this motion that at the time of the marriage, the decedent was impotent and mentally incapacitated.

**STANDARD:**

As this matter is before the court by way of a motion to dismiss respondent's challenge for failure to state a claim upon which relief can be granted under *R.* 4:6–2(e), the court must search the pleadings in depth and with liberality to determine if a cause of action can be gleaned even from an obscure statement, particularly if further discovery is to be taken. *See Printing Mart v. Sharp Elec.,* 116 *N.J.* 739, 746, 563 *A.2d* 31 (1989). Every reasonable inference is therefore to be accorded the plaintiff and the motion is granted only in rare instances and ordinarily without prejudice. *See also Fazilat v. Feldstein,* 180 *N.J.* 74, 78, 848 *A.2d* 761 (2004); *Smith v. SBC Commc'n Inc.,* 178 *N.J.* 265, 282, 839 *A.2d* 850 (2004). Moreover, a complaint should not be dismissed under *R.* 4:6–2(e) where a cause of action is suggested by the facts and a theory of actionability may be articulated by amendment of the complaint. *See, Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.2d* 31

**STANDING:**

 As a threshold matter, petitioner argues that this cause of action is improperly before the court on the grounds that respondent has no standing to object to the validity of the deceased's marriage. Standing is governed by *R.* 4:26–1, which provides that "[e]very action may be prosecuted in the name of the real party in interest. . . ." There is no distinction between a party in interest and standing in New Jersey. *N.J. Citizen Action v. Riviera Motel Corp.,* 296 *N.J.Super.* 402, 413, 686 *A.2d* 1265 (App.Div.1997).

 To be entitled to sue, a party must have "a sufficient stake and real adverseness with respect to the subject matter of

the litigation." *In re Adoption of Baby T.*, 160 *N.J.* 332, 340, 734 *A.*2d 304 (1999). Additionally, "[a] substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for the purposes of standing." *Ibid.* Standing has been broadly construed in New Jersey as "our courts have considered the threshold for standing to be fairly low." *Reaves v. Egg Harbor Tp.*, 277 *N.J.Super.* 360, 366, 649 *A.*2d 904 (Ch.Div. 1994).

Under this standard, it is evident that respondent has standing to bring the instant claim against the widow of her deceased brother. As an heir of his estate under the laws of intestacy, she stands to inherit from his estate should the marriage be annulled and receive nothing if the marriage is found valid.

**HISTORICAL BASIS:**

Before turning to the statutory interpretation of *N.J.S.A.* 2A:34–1, it is important to consider the history of the void and voidable distinction that has for centuries been the guide to determining whether a marriage can be annulled under common law.

Historically, annulments were based upon canon law. W.W. Allen, Annotation, *Right to Attack Validity of Marriage After Death of Party Thereto*, 47 *A.L.R.*2d 1393 (2004). Initially, the ecclesiastical courts of England possessed jurisdiction to hear such matters and to establish the impediments to marriage which would permit an annulment. *Ibid.* During the time of King Henry VIII, the Parliament found certain impediments to be unreasonable and therefore granted authority to the law courts to restrain the ecclesiastical courts from interfering with those marriages that were free from those impediments set forth by statute. 10 *New Jersey Practice, Marriage, Divorce and Separation* § 31, at 22 (Paul N. Silverman) (rev. 4th ed. 1978) (citing 32 Hen. 8, c. 38 (Eng.)). Eventually, the law courts heard annulments. *Ibid.* But the law court judges were presumed incompetent to apply the canon law so that whenever a marriage was attacked collaterally in a law court for a canonical disability, the marriage was held to

be valid. *Ibid.* Canonical disabilities were those disabilities such as consanguinity, affinity, and certain corporal infirmities. Allen, *supra,* 47 *A.L.R.*2d 1393 (2004). The law courts held that such canonical disabilities made the marriage voidable and not *ipso facto* void until a sentence of a nullity was obtained. *Ibid.* Such marriages were considered valid for all civil purposes until a sentence of a nullity was entered during the lifetime of the parties. *Ibid.*

On the other hand, the common law courts took cognizance of civil disabilities which rendered the marriage absolutely void. Silverman, *supra,* § 31 at 22. Civil disabilities were those such as want of age, idiocy, and the like, which made the marriage contract void ab initio. *Ibid.* Those courts held that these disabilities did not dissolve a contract already made but rendered the parties incapable of contracting at all. *Ibid.* It was held, therefore, that a relationship based on such a marriage was meretricious and not a matrimonial union. *Ibid.* Because the courts held that such marriages were void ab initio, the marriage could be collaterally attacked even after the death of one of the parties. Allen, *supra,* 47 *A.L.R.*2d 1393 (2004).

It can be seen, therefore, that out of the confusion in jurisdiction between the ecclesiastical and law courts of England grew the distinction between void and voidable marriages. Silverman, *supra,* § 31 at 22. This distinction is firmly rooted within the common law and the law of New Jersey. *See, e.g., Minder v. Minder,* 83 *N.J.Super.* 159, 199 *A.*2d 69 (Ch.Div.1964).

**THE LAW IN OTHER JURISDICTIONS:**

While out-of-state cases are not binding upon this court, but rather merely persuasive authority to be accorded respectful attention, they are helpful to discern the thinking in this area. *See, Unicon Inv. v. Fisco, Inc.,* 137 *N.J.Super.* 395, 403, 349 *A.*2d 117 (Law Div.1975).

A survey of the law in other states shows that the prevailing rule continues to provide that a void marriage may be annulled

after the death of one of the parties in the absence of a statute to the contrary. *See, Estate of Davis,* 55 *Or.App.* 982, 640 *P.*2d 692 (1982) ("A void marriage, ... is invalid from the outset and may be challenged by third parties."); *Kuehmsted v. Turnwall,* 103 *Fla.* 1180, 138 *So.* 775 (1932) (holding wife was of unsound mind, insane and wholly incompetent at time of marriage to husband nine days before her death; thus, marriage was void ab initio, and heirs of decedent permitted to bring annulment action after the wife's death); *Succession of Ricks,* 893 *So.*2d 98 (La.Ct.App.2004) (holding a child alleging deceased father lacked capacity to enter contract of marriage, acting as succession representative, is the property plaintiff to bring action to have marriage annulled under statute giving succession representative authority to sue to enforce a right of the deceased, whether the action is personal, real or mixed); *In re Canon's Estate,* 221 *Wis.* 322, 266 *N.W.* 918 (1936) (holding because a void marriage is an absolute nullity from its beginning and cannot be ratified, it may be questioned during the life of the parties to the marriage, and with some statutory exceptions, after the death of either or both, directly or collaterally).

In 1932, the Court of Appeals of Kentucky, found that the heirs could maintain a suit to have a decedent's marriage declared void due to the decedent's lack of mental capacity at the time of entering the marriage contract. *Johnson v. Sands,* 245 *Ky.* 529, 53 *S.W.*2d 929, 931 (Ky.Ct.App.1932). The court noted that on

> the question as to whether a marriage of a mentally incompetent person is void or voidable, the most universally accepted rule is that, in the absence of a controlling or influencing statute to the contrary, such a marriage is absolutely void in its inception, and continues so, and that no judicial pronouncement to that effect is necessary to restore the parties to their original rights, in consequence of which it may be collaterally attacked by any interested person at any time and in any proceeding where its validity is raised.
>
> [*Id.* at 930 (quoting *L.R.A.* 1916C, p. 700).]

It also seems that a statutory enactment changing the common law rule may vary the rule. *See, Estate of Fuller,* 862 *P.*2d 1037 (Colo.Ct.App.1993) (construing statute providing that action for annulment based on lack of capacity to consent may be brought by

either party to the marriage or by the legal representative of the party who lacked capacity to consent no later than six months after the petitioner obtained knowledge of the condition but not after death of either part; holding because a challenge to the validity of a marriage is barred if not timely pursued, a marriage under such circumstances is voidable, and children cannot challenge it after death of a party to the marriage); *Estate of Crockett*, 312 *Ill.App.*3d 1167, 245 *Ill.Dec.* 683, 728 *N.E.*2d 765 (2000) (finding common law altered by statute providing that either party to a marriage may challenge its validity for lack of capacity, fraud or duress, and if person is legally incompetent, that person's guardian may bring the action, within ninety days of the moving party becoming aware of the defect or before either party to the marriage dies); *Vance v. Hinch*, 222 *Ark.* 494, 261 *S.W.*2d 412 (1953) (holding statute changed common law to provide that marriage involving one incapable of consenting is voidable; thus, such a marriage is "vulnerable to attacks made in the lifetime of the spouses only."); *Patey v. Peaslee*, 99 *N.H.* 335, 111 *A.*2d 194 (1954) (holding despite common law, where legislature has specified certain marriages as void but has not prescribed that marriage of a mentally incompetent person is void; it is voidable and the proceedings should have been brought during the lives of both the contracting parties); *Ivery v. Ivery*, 258 *N.C.* 721, 129 *S.E.*2d 457 (1963) (holding common law rule has been modified by statute so that marriage of a person incapable of contracting for want of understanding is not void ipso facto; but if and when declared void, it is void ab initio, and such marriage, when followed by cohabitation and the birth of issue, may not be declared void after the death of either of the parties to the marriage).

## STATUTORY ANALYSIS:

By legislation, effective September 13, 1971, actions for annulments in New Jersey are governed by statute.

*N.J.S.A.* 2A:34–1 provides:

Judgments of nullity of marriage may be rendered in all cases, when:

a. Either of the parties has another wife or husband living at the time of a second or other marriage;

b. The parties are within the degrees prohibited by law. If any such marriage shall not have been annulled during the lifetime of the parties the validity thereof shall not be inquired into after the death of either party.

c. The parties, or either of them, were at the time of marriage physically and incurably impotent, provided the party making the application shall have been ignorant of such impotency or incapability at the time of the marriage, and has not subsequently ratified the marriage.

d. The parties, or either of them, lacked capacity to marry due to want of understanding because of mental condition, or the influence of intoxicants, drugs, or similar agents; or where there was a lack of mutual assent to the marital relationship; duress; or fraud as to the essentials of marriage; and has not subsequently ratified the marriage.

e. The demand for such a judgment is by the wife or husband who was under the age of 18 years at the time of the marriage, unless such marriage be confirmed by her or him after arriving at such age.

f. Allowable under the general equity jurisdiction of the Superior Court.

The enabling legislation does not explicitly make any distinction between a "void" and "voidable" marriage. *N.J.S.A.* 2A:34–1. While the statute does not use the terms "void" or "voidable," it can be gleaned from the individual provisions, as will be explored below, that the Legislature drew upon the common law distinctions as a guide to the framework of the statute.

**CHALLENGE TO THE MARRIAGE:**

The respondent attacks the marriage on four different grounds: (1) the deceased was impotent, *N.J.S.A.* 2A:34–1(c); (2) he was unable to consent to the marriage, *N.J.S.A.* 2A:34–1(d); (3) the marriage was based on fraud as to the essentials of the marriage, *N.J.S.A.* 2A:34–1 (d); and (4) there exist equitable reasons to declare the marriage void, *N.J.S.A.* 2A:34–1(f).

Each claim will be addressed in turn.

**IMPOTENCY CLAIM:**

■ This court interprets *N.J.S.A.* 2A:34–1(c) as providing that impotency, when the condition meets the statutory criteria, makes a marriage voidable at the election of the party to the marriage who did not know of the other's condition at the time of the marriage. It is well settled that a court must begin its interpreta-

tion of a statute with the actual language of the statute, giving the words used their plain meaning. *Nat'l City Mortgage v. Smith,* 324 *N.J.Super.,* 509, 514–515, 735 *A.*2d 1221 (Ch.Div.1999). "Where the wording of a statute is clear and explicit, judicial interpretation other than that called for by the language expressed therein is not permissible." *DeFlesco v. Mercer County Bd. of Elections,* 43 *N.J.Super.* 492, 498, 129 *A.*2d 38 (App.Div. 1957) (citations omitted). In subsection c, as in subsections a, b and d, the term "the parties" refers to the parties to the marriage. This is clear as the subsection speaks of the parties at the time of the marriage.

Subsection c next uses the term "party" in the singular. This singular term "party" refers to the party who can make the application for annulment and to the party who can ratify the marriage despite the impotency of one party to the marriage. A plain reading of the statute shows that this term, again, refers only to a party to the marriage.

"The Legislature is presumed not to include meaningless language in a statute." *Meadowlands Basketball Assoc. v. Dir. Div. of Taxation,* 19 *N.J.Tax* 85, 92 (2000) (citations omitted), *aff'd,* 340 *N.J.Super.* 76, 773 *A.*2d 1160 (App.Div.2001). If the term "party" were meant to refer to any applicant, plaintiff or movant, those terms would suffice. Instead, the Legislature joined "party" with the words "making the application" making it clear that the applicant must be a party to the marriage.

The use of "party" in the plural immediately preceding the singular reference was specific to parties to the marriage. It is presumed that "a word or phrase is used in the same sense throughout the statute." *DeFlesco, supra,* 43 *N.J.Super.* at 499, 129 *A.*2d 38. As indicated above, the term "parties" in subsection c and the other sections of *N.J.S.A.* 2A:34–1 refers to the parties to the marriage. Thus, this portion of the subsection logically can be read to make it clear that only a party to the marriage can be an applicant for annulment on the ground of impotency.

Here, the Legislature included in subsection c specific reference to "the party making the application" after defining "parties" as the parties to the marriage. It is logical to assume that the Legislature acted purposefully in doing so. Reading the subsection as making annulment on the ground of impotence a private cause of action accruing only to a party to the marriage is not contrary to Legislative intent; in fact, it makes sense in the situation. Unlike parties marrying within degrees prohibited by law or when one of the parties has another wife or husband at the time of the marriage—both situations in which the State's interest in protecting the health and welfare of the public, including potential children of such marriage or another spouse or family, is strong—here, it is logical that the parties to the marriage, alone, would determine whether their marriage shall be annulled due to impotency unknown to one, though existing at the time of the marriage.

The unique proofs required for this ground lend credence to the notion that this is a private right of the parties to the marriage. First, the party making the application must prove his or her ignorance of the impotency or incapability at the time of the marriage. It would be illogical for the Legislature to require a third person to show his or her lack of knowledge as to the impotence of one party to a marriage to which the third person has no part. Proving a negative is difficult enough, but it would be absurd for the Legislature to have any reason to allow a third party, ignorant of another's impotency, to act to annul a marriage involving two other people. In addition, subsection c contains a ratification provision, which, again, is subject to proofs primarily within the knowledge of the parties to the marriage.

■ Subsection c is written in the present tense, i.e. "the party making the application." This implies that the party, specifically the husband or wife, is alive. Further, such a reading is reflective of the historical antecedents concerning corporal infirmities. Such an impediment was a canonical disability—hence voidable and was not subject to attack after death. Accordingly, for the reasons

outlined above, respondent's claim under *N.J.S.A.* 2A:34–1(c) is dismissed.

## LACK OF CONSENT:

■ *N.J.S.A.* 2A:34–1(d) provides that an annulment may be granted

"where the parties, or either of them, lacked capacity to marry due to want of understanding because of mental condition, or the influence of intoxicants, drugs, or similar agents; or where there was a lack of mutual assent to the marital relationship; duress; or fraud as to the essentials of marriage; and has not subsequently ratified the marriage."

The clause can be broken down into (1) inability to give consent; (2) lack of mutual assent; (3) duress; and (4) fraud as to the essentials of the marriage. Respondent argues that her brother did not have the mental capacity to give his consent and that the marriage constituted a fraud as to its essentials.

In interpreting the statute, the starting point is the language of the statute itself. If the language is clear, the sole function of the court is to enforce it according to its terms. *Velazquez v. Jiminez,* 172 *N.J.* 240, 798 *A.2d* 51 (2002). And if the language of the statute is clear and unambiguous, there is no need to look beyond its terms to determine legislative intent. *Cutler v. Borough of Westwood,* 295 *N.J.Super.* 344, 349, 685 *A.2d* 44 (App.Div.1996). The plain language of subsection d does not preclude a post-humous cause of action for lack of consent and further does not require that the action be brought only by one of the parties to the marriage. This was not always the case. Prior to the 1971 amendment, subsection d was phrased thus:

d. The parties or either of them, were at the time of marriage incapable of consenting thereto and the marriage has not been subsequently ratified, provided that where the party capable of consent is the applicant, such party shall have been ignorant of the other's incapacity at the time of the marriage and shall not have confirmed the marriage subsequent to the regaining of capacity by the other party.

That prior language implies that it was only an application brought by one of the parties to the marriage that was within the Legislature's contemplation.

Further, subsection b specifically provides that if a marriage to be annulled on the grounds of consanguinity shall not have been annulled during the lifetime of the parties the validity thereof shall not be inquired into after the death of either party. *N.J.S.A.* 2A:34–1(b). The cannon of statutory construction *inclusio unius est exclusio alterius* (inclusion of one excludes the other) is helpful here. This is a rule of negative implication. If the drafter of a statute mentions one circumstance specifically, the implication is that the other circumstances, which just as logically could have been mentioned, were intentionally omitted. *Tp. Comm. of the Tp. of Neptune v. Stagg*, 312 *N.J.Super.* 312, 317, 711 *A.2d* 940 (App.Div.1998). Clearly, the Legislature could have included similar limiting language to subsection d had its intention been to limit that cause of action to the spouses within their lifetimes. Since the Legislature did not do so it is not appropriate for this court to read that into the otherwise plain language of subsection d.

This is also in accord with the historical void and voidable distinction. With regard to capacity to consent, the courts of this state have held that where there is a lack of capacity to consent, the incapacitated party is not capable of contracting the marriage and the marriage is void ab initio. *See, Minder*, at 163–64, 199 *A.2d* 69.

In this case, Mr. Santolino was eighty-one and one-half years old; he was hospitalized on March 4, 2004, and diagnosed with lung cancer; he was released on April 1, only to be readmitted on May 11 and he expired on May 20. Respondent argues that during this time, Mr. Santolino was heavily medicated, was undergoing chemotherapy, required the daily assistance of an in-home nurse and was hooked up to an oxygen tank during his wedding to the petitioner. Under this factual setting, an argument certainly can be made that Mr. Santolino lacked the capacity to consent to the marriage.

Thus, if Mr. Santolino lacked the capacity to consent then his marriage will be rendered void ab initio. Both at common law and under *N.J.S.A.* 2A:34–1(d), the civil disability of inability to con-

sent to the marriage allows the court to render a posthumous judgment of nullity with regard to the marriage at issue because a void marriage is deemed not to have been a marriage at all. Accordingly, petitioner's motion to dismiss respondent's claim as to lack of consent is denied.

### FRAUD AS TO THE ESSENTIALS OF THE MARRIAGE:

Respondent's third argument for annulling the marriage is that it was the product of a fraud as to the essentials of the marriage. The courts have defined "fraud in the essentials" to include a number of different factual scenarios in which one spouse omits to mention or misrepresents an issue so material that it goes to the very essence of the marriage relationship constituting grounds for annulment.[2] There is inherent jurisdiction in a court of equity to annul fraudulent contracts, including the contract of marriage. *V.J.S. v. M.J.B.*, 249 *N.J.Super.* 318, 592 *A.*2d 328 (Ch.Div.1991). However, a determination of whether a spouse's fraud goes to the essentials of a marriage warranting an annulment must be decided on a case-by-case basis since what is essential to the relationship of the parties in one marriage may

---

[2] For example, evidence that after plaintiff entered into contract for marriage by proxy with defendant, a resident of Cuba, defendant repeatedly refused to join plaintiff in the United States, evidence that marriage was not consummated and that defendant did from inception of marriage form fixed determination not to consummate marriage established that defendant committed such fraud as to constitute ground for annulment. *Lopez v. Lopez*, 102 *N.J.Super.* 253, 245 *A.*2d 771 (Ch.Div.1968). Where plaintiff had been a deeply religious Orthodox Jew throughout her life and, in light of the far-reaching requirements of that religion, could not properly have performed the duties of wife and mother following the rules and teachings of her faith without the support of a husband holding the same beliefs, and where defendant knowingly misrepresented to plaintiff that he was also a practicing Orthodox Jew, and thereby induced plaintiff to marry him, plaintiff was entitled to annulment on ground of "gross and far-reaching" fraud, though the marriage had been consummated. *Bilowit v. Dolitsky*, 124 *N.J.Super.* 101, 304 *A.*2d 774 (Ch.Div.1973). Husband's concealment prior to marriage of intent to have children contrary to expressed antenuptial agreement not to have children was a fraud which went to essentials of marriage and warranted annulment. *V.J.S. v. M.J.B.*, 249 *N.J.Super.* 318, 592 *A.*2d 328 (Ch.Div.1991).

be of considerably less significance in another. *Ysern v. Horter*, 91 *N.J.Eq.* 189, 110 *A.* 31 (Ch.Div.1920).

 While respondent raises this claim, her papers do not articulate any particulars to support same. *R.* 4:5–8 requires fraud to be pled with particularity. There are no factual allegations in the pleadings on this claim.

 The plain language of the statute, though, does not prohibit such a claim from being raised posthumously (see analysis above as to lack of consent). Furthermore, since this is a civil disability, there is historical support for permitting a posthumous declaration of annulment on this ground. However, even under the liberal *R.* 4:6–2(e) standard, the court finds no basis for allowing respondent to proceed on this theory at this time. A search of the pleadings gives no hint of a basis for this claim. Where a fraud pleading does not include the required specificity, the pleader should ordinarily be afforded the opportunity of amending the pleading in lieu of dismissal. *See, Rebish v. Great Gorge*, 224 *N.J.Super.* 619, 541 *A.2d* 237 (App.Div.1988). Accordingly, respondent's claim of fraud as to the essentials of the marriage is dismissed without prejudice. Respondent will be afforded the opportunity to amend her pleading should discovery reveal any specifics that will support such a claim.

### GENERAL EQUITY JURISDICTION TO ANNUL:

 Finally, respondent argues that this court has the power to annul the marriage because (1) *N.J.S.A.* 2A:34–1(f) provides that a judgment of nullity may be rendered pursuant to the general equity jurisdiction of the Superior Court, and (2) a Court of Chancery has jurisdiction independent of a statute to annul a marriage for fraud, want of mutual consent, or duress based on its inherent powers to grant equitable relief. The plain language of subsection f indicates a choice by the Legislature to provide an express grant of authority to a court of equity to exercise its general equity jurisdiction in those cases that do not fit neatly into one of the specifically delineated categories.

An equity court's powers have been expressed, in part, in some of the following maxims: "equity will not suffer a wrong without a remedy;" *Crane v. Bielski,* 15 *N.J.* 342, 349, 104 *A.2d* 651 (1954); "equity regards substance rather than form;" *Stochastic Decisions v. DiDomenico,* 236 *N.J.Super.* 388, 393–95, 565 *A.2d* 1133 (App.Div.1989); "he who seeks equity must do equity" *Pellitteri v. Pellitteri,* 266 *N.J.Super.* 56, 628 *A.2d* 784 (App.Div.1993); and "equity will not knowingly become the instrument of injustice." *Weisbrod v. Lutz,* 190 *N.J.Super.* 181, 462 *A.2d* 610 (App. Div.1983). Pursuant to these guiding principles, a court of equity is empowered to prevent one party from acquiring the benefits of marriage when the marriage itself was somehow illicit.

In *Carr v. Carr,* 120 *N.J.* 336, 346, 576 *A.2d* 872, (1990), a woman sued her estranged husband for divorce. During the proceedings, her husband died and left his entire estate to his children by a former marriage and she did not qualify for an elective share. The trial court determined that the husband's death terminated the wife's claims for equitable distribution and alimony. The court, however, viewed the action as essentially one of equity and allowed the plaintiff to amend her complaint to pursue alternate equitable remedies to prevent a failure of justice. The appellate court affirmed as did the Supreme Court. The Supreme Court characterized the problem thus: "If she is not entitled to relief under either statute, a plight created by her husband's supervenient death, we must determine whether the dual statutory schemes express a design to deny any relief at all." *Id.* at 346, 576 *A.2d* 872. The Court determined that although explicitly the wife's cause of action under the divorce statute terminated upon the death of her husband, implicit within the statute was an acknowledgment that the statutory scheme of equitable distribution is based on equitable principles. *Id.* at 348, 576 *A.2d* 872.

As guidance to courts in future cases, the Court stated that,

"in the exercise of their common law jurisdiction, courts should seek to effectuate sound public policy and mold the law to embody the societal values that are exemplified by such public policy. In this process, courts should be responsive to

legislation as expressive of public policy, which can serve to shape and add content to the common law, even though such legislative expressions may not be directly applicable or binding in the given matter." *Id.* at 351, 576 *A.2d* 872.

The Court specifically referred to *N.J.S.A.* 2A:34–1(f), noting that a court may nullify a marriage under its general equity jurisdiction, as support for the point that the Legislature recognizes that courts' equitable powers are particularly appropriate in the context of domestic relations. *Ibid.*

The plain language of subsection f provides no limitation on posthumous applications for annulment. Furthermore, this general grant of authority to courts of equity to exercise their equitable powers is a deviation from the common law and thus, the historic void/voidable distinction which addressed the survival of an annulment claim, does not apply.

In light of the court's inherent equity jurisdiction; the clear statutory grant to this court to utilize its equitable powers to annul an illicit marriage; the plain language of the subsection which does not bar a posthumous application for annulment; and the facts alleged here, this court will allow respondent to pursue her claim under subsection f.

**CONCLUSION:**

Based upon the foregoing analysis, petitioner's motion to dismiss is granted with prejudice as to the claim of impotency; granted without prejudice as to the claim of fraud in the essentials of the marriage; and denied without prejudice as to the claims of inability to consent and as to those permitted under the court's general equity jurisdiction. Petitioner's counsel is to submit an order in conformance with this opinion.